## Case No. 1,319.

### BENNETT v. BOGGS.

[Baldw. 60.] [1]

Circuit Court, D. New Jersey. April Term, 1830.

FISHERIES—DELAWARE RIVER—COMPACT BETWEEN NEW JERSEY AND PENNSYLVANIA — CONSTITUTIONAL LAW — IMPAIRING OBLIGATIONS OF CONTRACTS.

1. The compact between New Jersey and Pennsylvania recognises the right of fishery in riparian owners on the Delaware.

2. The third section of the act of 1808, defining a fishing place, applies only to shore fisheries: a common right of fishery is necessarily indefinite.

3. The penalties of the law of 1822 attach to any person who uses a gilling seine or drift net on the Delaware, unless he has the right of fishing on the opposite shore.

4. An entry under this law by a person claiming only by common right is void.

5. This court must decide on a state law precisely as the courts of the state ought to do.

6. The act of 1822 is not repugnant to the constitution of the United States.

7. The proprietors of New Jersey had no right in the Delaware beyond low water mark.

[Cited in Pea Patch Island, Case No. 10,872.]

8. The right to the bed of the river was in the crown, therefore the compact of 1676 did not give a common right of fishery therein.

9. The rights of the crown devolved on the states by the Revolution, and were confirmed by the treaty of peace to them in their sovereign capacity.

[See M'Ilvaine v. Coxe, 4 Cranch, (18 U. S.) 209; Bank of U. S. v. Daniel, 12 Pet. (37 U. S.) 33; Martin v. Waddell, 16 Pet. (41 U. S.) 367; Russell v. Jersey Co., 15 How. (56 U. S.) 426.]

10. The constitution of New Jersey confers general powers of legislation.

[Cited in Bonaparte v. Camden & A. R. Co., Case No. 1,617.]

11. The legislature has power to regulate fisheries on the Delaware, by prohibiting the exercise of a common law right.

[Cited in Bonaparte v. Camden & A. R. Co., Case No. 1,617; Atkinson v. Philadelphia & T. R. Co., Id. 615; The Martha Anne, Id. 9,146. See, also, Smith v. Maryland, 18 How. (59 U. S.) 71.]

12. The only restraint upon them is, that they cannot, by any law, impair the obligation of a contract.

[Cited in Bonaparte v. Camden & A. R. Co., Case No. 1,617.]

[See, also, Green v. Biddle, 8 Wheat. (21 U. S.) 1; Spooner v. McConnell, Case No. 13,-245; Baltimore & S. R. Co. v. Nesbit, 10 How. (51 U. S.) 395; Griffing v. Gibb, Case No. 5,819.]

13. If a right is not founded in a contract, or secured by the constitution, it may be taken away by a state law, however long it may have been exercised.

14. This court can inquire only into the constitutional power of the legislature; not on the policy, justice, or wisdom of their acts.

[See Fuentes v. Gaines, Case No. 5,145.]

15. Neither the state or federal constitution secures a common right of fishery in the Delaware to the people of New Jersey.

[1] [Reported by Hon. Henry Baldwin, Circuit Justice.]

At law. This case came before the court on a case stated by counsel, as follows: "This action is brought for the recovery of eight penalties, under the seventh section of the supplement to an act of the legislature of New Jersey regulating fisheries in the river Delaware, passed November 28th, 1822, and assented to and adopted by the legislature of Pennsylvania January 29th, 1823, prohibiting the use of gilling seines in said river, except in certain cases, mentioned in a previous section of the act, under a penalty of 250 dollars for each and every such offence. The plaintiff resides at, and rents, and fishes a shore fishery in the township of Waterford, in the county of Gloucester. His haul is from the upper line of the lands of Benjamin Cooper down to the mouth of Cooper's creek. Petty's island lies between this fishery and the Pennsylvania shore. On part of this island, on the Jersey side, is another fishery; so that the two seines sweep partly over the same pool, when out, though hauled in on different sides of the river. These gilling seines are made of fine twine, so as to be imperceptible to the fish, whilst the water is turbid from the spring freshets, when they are most successfully used. They are usually about fifty or sixty fathoms in length; are extended across the channel, and drift with the tide. In passing up the river, all the fish which come in contact with them, and are too large to pass through the mesh of the net, are entangled by their gills, and, seldom able to extricate themselves, are thus taken, from whence these seines derive their name. The defendant's net was of the size authorized by the act to be used in certain cases. The defendant is a citizen of Pennsylvania, and resident in the county of Philadelphia. He owned a gilling seine, and was in the habit of drifting between the island and Jersey shore, both in and below the pools of the above named fisheries. On the 23d, 24th, 25th and 26th days of March last, the defendant and one William Eager were drifting in the channel of the river with their net, opposite to the fishery of the plaintiff, when their net and boat were seized on the last named day, at the instance of the plaintiff, and the summons in this cause served on the defendant. This seine, when taken, was not within the sweep of the plaintiff's net, nor so as to obstruct him in his haul. The boat and seine were adjudged to be forfeited by two justices, and ordered to be sold. The defendant appeared on the return day, and caused his appearance to be regularly entered. The defendant has given a bond to the prothonotary of the court of common pleas of Philadelphia county, accompanied by the following description, viz.: (Description) 'From Samuel Bower's wharf and lands at Kensington to Fisher's Point, the size of the net is about fifty fathoms, and of a mesh of about six inches. Samuel Boggs.' (Prout the bond and description.)

It is admitted that there is a mistake or clerical error in this description, and that it should have been Fish's Point, instead of Fisher's, there being no such place as the latter. Bower's lands and wharf are in Kensington, in the city and county of Philadelphia, in the state of Pennsylvania; and Fish's Point is in the township of Waterford, aforesaid, in this state, about five miles above Kensington. On each side of the river there are numerous owners of the shore within the bounds of this description, from whom the defendant had no lease or permission to enter a fishery in front of their lands. The defendant, when taken, was drifting within the bounds named in his description, that is to say, below Fish's Point, and above Bower's wharf, nor had he at any time fished above low water mark with his seine, or entered upon the shore of the plaintiff, but had always drifted in that part of the river which is covered with water at all times of the tide. (These fisheries on the river Delaware have been used and occupied by the respective owners of the adjacent shores as private property, before and ever since the Revolution). The defendant therefore insists that he has a right to fish with his seine in any part of the river Delaware, by virtue of the aforesaid bond and description within the bounds therein mentioned. But he furthermore insists that the act under which the plaintiff seeks to recover is unconstitutional and void, being in restriction of a right common to all the citizens of the United States, and that no recovery can be had by virtue thereof. The plaintiff insists that the bond and description given by the defendant is not in compliance with the act, and that he had no right to drift with his net in the river Delaware; and, moreover, that the said act is constitutional, and the provisions therein contained wise and salutary, and greatly beneficial to the community, in preserving a valuable species of fish, which the gilling seines have a tendency to destroy and frighten from our waters. Upon this statement of facts it is agreed to submit this case to the court. If they shall be of the opinion that the defendant was authorized under the act to fish by virtue of his license, or that the act is unconstitutional, then that judgment shall be entered for the defendant, with costs; otherwise, that judgment shall be entered in favour of the plaintiff, with costs of suit. And it is further agreed that the copies of the several acts of the states of Pennsylvania and New Jersey, relative to fisheries in said river, printed in the Pamphlet Laws of said states, shall be read in this court; and that either party shall be permitted to turn this state of the case into a special verdict." Dated, September 9th, 1829.

The act of New Jersey, on which this suit is founded, is contained at large in the Pamphlet Laws of 1823, (page 30,) and in the Laws of Pennsylvania of the session of 1822–1823,

(page 19.) The points material to this case are the following: The fourth section (Pamph. Laws Pa. 1823, p. 19, &c., Laws N. J. 1823, p. 30) enacts, that every owner or possessor of a fishery on the Delaware, within the jurisdiction of New Jersey, shall, before he occupies the same, give to the clerk of the court of common pleas of the county wherein the fishery, or the greatest part thereof, may be, a description in writing of their pool or fishing place, designating the beginning and ending point, the extent on the river shore, the township and county where situated, the number of men generally employed in fishing the same—and shall give bond with surety to the said clerk, to the amount of 500 dollars, conditioned for the payment of all fines and penalties created by this law, and incurred by any infraction thereof; which description and bond shall be filed in the clerk's office. If any person shall fish in any fishery so entered, or draw a net within the same, or in the river opposite the shore included within the boundary thereof, without the permission of the owner or possessor, he shall forfeit 250 dollars. By the fifth section, the same penalty is imposed on any person who shall make use of a seine or net in the Delaware, within the jurisdiction of the state, or of the concurrent jurisdiction of the state and Pennsylvania, between the 1st of April and 10th of July, without having so entered their fishery, or at any place on the Delaware within the state, other than opposite the shore boundaries of a fishing place or pool so described and entered. Section 6, Pamph. Laws Pa. 21, authorizes the owner or possessor of any fishery on the Delaware, within the jurisdiction of the state, below Trenton, who has entered the same as a fishery, and given bond to fish in front of, and opposite the bounds thereof, with a gilling seine or drift net of mesh not larger than six and a half inches, and the net not more than six fathoms in length—the boat used, to have the name and place of abode of the owner painted legibly on the gunwale thereof. The seventh section imposes a penalty of 250 dollars on any person who shall use a gilling seine or drift net in the Delaware within the sole or concurrent jurisdiction of the state, without first entering his seine or net, and giving bond, or beyond the angles of the shore boundaries of a fishery so entered, or with a mesh larger or a net longer than mentioned in the sixth section, between the 1st of March and 10th of July. The thirteenth section, in addition to the penalties, creates a forfeiture of the boat, seine, net and tackling, used in violation of the law.

This act was a supplement to an act of 1808, which, in the third section, defined a pool or fishing place to be "from the place or places where seines or nets are usually thrown in, to the place or places where they have been usually taken out; or from the place or places where they may hereafter be thrown into the water, to the place or

places where they may be taken out." The fifth section imposes a penalty of 100 dollars on any person who shall use a gilling net in the Delaware. 5 Smith Laws, 8, 9. Both of these laws were adopted in Pennsylvania, and declared to have the same effect on the citizens of that state as on those of New Jersey. This was deemed necessary by Pennsylvania, as by the compact between the two states, made in April, 1783, it was agreed that the river should be a common highway for each state, with concurrent jurisdiction on the water, each retaining jurisdiction on the dry land between the shores, and that all offenses or trespasses committed on the river, should be cognizable in the state where the person charged should be first apprehended. By a proviso in the third clause, the legislature of each state may exercise the right of regulating and guarding the fisheries on the Delaware annexed to their respective shores, in such manner that the said fisheries may not be unnecessarily interrupted during the season for catching shad, by vessels riding at anchor on the fishing ground, or by persons fishing under claim of a common right on said river. 2 Dall. Laws, 143, 145; Patt. Laws, 47, 49, 76, 77. The declaration set forth, that on the 23d of March, 1829, at the township of Waterford, county of Gloucester, and state of New Jersey, the defendant made up a gilling seine or drift net in the river Delaware, without having entered his gilling seine or drift net fishery, or giving bond or making a description of his pool or fishing place, or designating the number of men employed therein according to law. It also set forth the same act committed on seven other different days. The defendant pleaded nil debet.

Mr. Wall and Mr. Wood, for plaintiff.

1. The entry of the defendant is not such a one as is contemplated by the sixth section of the act of 1822, and will not excuse him from the penalties of the seventh section. Such entry can only be made by the owner of the land on the shore of the river, and for a pool or fishery in front thereof: that made by the defendant is for a fishery in the Delaware, opposite the land of others, where he can acquire no right under the fourth section: he comes, therefore, directly within the penalties of the law. The only question which can arise is on the validity of the law, on the ground of its repugnance to the concessions made by the proprietors of Jersey in 1676, (Leaming & S. 390,) the constitution of the state, and the United States. The grant from the king to the Duke of York, and from him to Carteret and Barclay, was bounded by the river Delaware: so was the grant to William Penn. Leaming & S. 3, 8, 10. The right to the bed and waters of the river was therefore in the king, and neither of the proprietors could have any right therein, or to the islands or fisheries. 1 Chalm. Op. 59; [Corfield v. Coryell, Case No. 3,230;]

[Handly's Lessee v. Anthony,] 5 Wheat. [18 U. S.] 374. As the river was the property of the crown before the Revolution, the right to it devolved on the two states by that event; they claimed to the middle of the river, and the treaty of peace with Great Britain confirmed and ratified their claim. The concessions of the proprietors of Jersey, in 1676, could not bind the crown, or the states on whom its rights devolved; the proprietary governments were mere riparian owners, who might grant any rights to low water mark, but no further. Though they claimed and exercised the right to regulate the fisheries in the Delaware before the Revolution, (Leaming & S. 480, § 13; Allin. Laws, 279, c. 412, 80, 559,) yet it was without any authority over the bed of the river. Immediately after the peace, in April, 1783, New Jersey and Pennsylvania made a compact by which the Delaware was made a common highway, with a proviso that each state might regulate the fisheries annexed to the respective shores, so that they might not be interrupted by vessels at anchor, or persons fishing by common right. Rev. Laws N. J. 57; 2 Dall. Laws 143, 145. This was an express recognition of the rights of riparian owners to the fisheries on the shores of the Delaware, as they had existed from time immemorial in New Jersey. They were subject to the public rights of navigation, and of government in their regulation, but the shore owners had the exclusive right of fishing in front of their lands; the laws regulating such right affirmed its existence, and were passed for their protection. The right of fishery was descendible and alienable as other property, and might be conveyed separate from the land to which it had belonged, and as such has been uniformly recognised by the laws. Patt. Laws, 417, 543, 653. There is no common right of property in New Jersey, and the public right consists only in jurisdiction. 4 Griff. Law Reg. 1286, 1294. So far as the right of fishery in navigable waters is public, it may be regulated by law at the discretion of the legislature. Vatt. Law Nat. b. 1, c. 20, §§ 234, 235, 239, 244–248, p. 168.

But if the right is common, the legislature of New Jersey has full power, by the state constitution, to regulate and control this right as they please, both as the sovereign power of the state, and by the rights which devolved on the state from the crown. The compact between the states was before the adoption of the constitution of the United States, which cannot have a retrospective operation upon it, on general principles. Ruth. Inst. c. 5, pp. 88, 99. Neither the compact or the laws are repugnant to the constitution: it has been decided by this court that the laws regulating oyster fisheries are constitutional. 4 Wash. C. C. 377, 378, [Corfield v. Coryell, Case No. 3,230;]. [Gibbons v. Ogden,] 9 Wheat. [22 U. S.] 203; [Willson v. Black Bird Creek Marsh Co.,] 2 Pet. [27 U.

S.] 251, S. P. The same decision has been made in Pennsylvania. Kean v. Rice, 12 Serg. & R. 203. The right of a state to regulate fisheries has been recognised in Massachusetts, (5 Mass. 266, 269;) in Connecticut, (2 Conn. 481;) in New York, (20 Caines, 90;) and New Jersey, (1 Halst. [6 N. J. Law,] 78.) It is a general principle of jurisprudence, laid down by all writers. Harg. Law Tracts, 10, &c.; Ang. Water Courses, 102, 108; Chit. Game Laws, 425; 1 Bl. Comm. 160. It cannot be denied that this power was in parliament, or that the powers of parliament devolved on the states by the Revolution. [Dartmouth College v. Woodward,] 4 Wheat. [17 U. S.] 651; [Johnson v. M'Intosh,] 8 Wheat. [21 U. S.] 584. And the constitution of New Jersey has imposed no restriction on the power of the legislature, who may limit, restrain and control the right of fishery in the Delaware, whether it is common or public, or grant the exclusive right to riparian owners. Their rights have been always recognised; and from their long enjoyment without interruption, a public grant will be presumed. Bealey v. Shaw, 6 East, 214; Cowp. 102, 103; 3 Durn. & E. [3 Term R.] 159; 3 Bl. Comm. 264. And when the right enjoyed has been exclusive, the grant will be presumed to have been so. The prohibition of the constitution of the United States against impairing the obligation of contracts, extends only to private rights,—[Dartmouth College v. Woodward,] 4 Wheat. [17 U. S.] 629, 630,—not to public corporations,—[Terrett v. Taylor,] 9 Cranch, [13 U. S.] 52,—nor to a law directing payment for improvements on land recovered under an adversary title,—2 Gall. 138, [Society for the Propagation of the Gospel v. Wheeler, Case No. 13,156,]—nor to an ex post facto law passed by a state during the Revolution,—[Pierce v. Turner,] 5 Cranch, [9 U. S.] 173. Admitting that there was a common right of fishery in all the inhabitants of the state, it was competent for the legislature to take it away, and give the exclusive right to riparian owners, as it did not impair the obligation of a contract. It is no constitutional objection to a state law that it takes away a vested right, unless it is repugnant to the constitution of the state. Satterlee v. Matthewson, 2 Pet. [27 U. S.] 410.

Mr Croxall and Mr Southard, for defendant.

The legislature may regulate the fisheries in the Delaware by prescribing the mode, &c. of catching fish, the kind of seines, the time of the year for fishing, and otherwise direct how the common right of fishing may be enjoyed. But they cannot prohibit the exercise of the right, which is common to all the inhabitants of the state, to fish in the Delaware, which is an arm of the sea, a navigable river, where the tide ebbs and flows as far as Trenton. This right is secured by Magna Charta to all the subjects of England, and cannot be made private property. Paley's Mor. Phil. 80. The enjoyment of this right is secured to the public in all civilized nations; the sea, the shore, and right of fishing therein, are common property, which cannot be appropriated to private use. Code Nap. Justin, 67; 1 Pandects, tit. 8; 3 Kent, Comm. 342; Gro. B. P. b. 2, c. 3; Puff. Law Nat. b. 4, c. 6; 2 Dom. Civil Law, p. 400, b. 1, § 1. The title to tide water rivers and arms of the sea, by the law of England, is in the king, for common benefit, and he cannot by his prerogative grant them for private purposes, since the adoption of Magna Charta. Bracton, b. 12; Glanv. b. 9, c. 2; 1 Reeve, Eng. Law, 224; Dav. Ir. K. B. 56; Chit. Game Laws, 243, 269. The king's grant can give an exclusive right to take none but royal fish. 1 Mod. 105; 6 Mod. 73. A subject has a right to fish in all navigable rivers for common fish, (1 Salk. 357;) and no prescription against this common right is good, (4 Durn. & E. [4 Term R.] 439; 6 Mod. 163; Willes, 265;) or for a free or exclusive fishery, unless the prescription goes as far back as the time of Henry II., (2 Bl. Comm. 39; 2 Inst. 30, 272; Mag. Char. § 3.)

It is a bad traverse to set up a private right of fishery in an arm of the sea. 2 H. Bl. 182. Prima facie, every subject has a right to take fish on the sea shore, between high and low water mark, (2 Bos. & P. 472;) and by the common law there can be no private right below low water. Beyond that, the right is a public one, a res sacra, which is unalienable, as it concerns the country at large; Schultes, Aq. Rights, 10, 17, 62–73. A private grant is good only so far as it does not interfere with the public right. Id. 79, 128. The charter to the Duke of York could give no private right of fishery in the Delaware below low water mark; a grant from the proprietors could not give it; and this, with the other principles of the common law, was adopted on the settlement of this state. 1 Bl. Comm. 157, 167; 1 Mass. 60; [Green v. Liter,] 8 Cranch, [12 U. S.] 242. And by act of assembly it was declared, that no man should be deprived of the benefit of the common law. Leaming & S. 128, 129, 369. The Duke of York was bound to govern according to the constitution of England. 1 Halst. [6 N. J. Law,] 70. And the constitution of the state continued the common law, and such statutes as had been practised on before its adoption. Article 22. The proprietors of New Jersey, in 1676, recognised the rights of the inhabitants according to the common law; granted them a common right of fishery in all the waters of the colony. Leaming & S. 390. And subsequent laws have confirmed this right. Allin. Laws, 309, 347; Patt. Laws, 18, 79. This right is so highly respected, that where A threw oysters into a public river in which there was a common right of fishery, and B took them away, A could not recover dam-

ages. 1 Penn. [2 N. J. Law,] 391. On the other hand, a person who fished in the Delaware by common right, recovered damages for cutting his seine. 2 Penn. [3 N. J. Law,] 936. And no law was ever passed denying this common right till 1808. Rev. Laws, 551. There is no private right of fishery in the waters of this state, (2 Pa. 943;) the shore owners have an exclusive right of drawing seines upon their land; but in the water, beyond the ebb of the tide, they have only a common right, (Arnold v. Mundy, 1 Halst. [6 N. J. Law,] 78;) such is the law in Pennsylvania, (Carson v. Blazer, 2 Bin. 475;) and in the other states the private right of fishery depends on the ownership of the bed of the river, (17 Johns. 195;) or on a grant to low water mark, (2 Conn. 481; 6 Conn. 518; 4 Mass. 315, 140; 3 Greenl. 269.) There must be an express grant by the state to give a private right beyond it. 3 Kent, Comm. 336, 344. When a river is the boundary between two states, they have each a right to the middle: but there can be no private property by virtue of riparian ownership beyond the low watermark. [Handly's Lessee v. Anthony,] 5 Wheat. [18 U. S.] 374. No grant can be presumed in favour of the shore owners which the proprietors were not authorised by the charter or the deed of the duke of York to make; they had no right in the bed of the river; and as their express grant could confer no right, a grant by prescription could have no more force.

But if such a grant could be presumed in a common case, it cannot be where it would be unconstitutional. 16 Mass. 488. The common right of fishery was secured to the inhabitants of the state by the compact of the proprietors in 1676, which no law can impair; it is an inviolable right, (1 Bl. Comm. 48,) which courts will protect by declaring a law repugnant to it to be unconstitutional, and void, (1 Bin. 419; [Vanhorne's Lessee v. Dorrance,] 2 Dall. [2 U. S.] 304.) The legislature cannot take away a vested right, (7 Johns. 493;) or transfer the property of A to B, (2 Bay, 252; [Ogden v. Blackledge,] 2 Cranch, [6 U. S.] 277; [Roach v. Com.,] 2 Dall. [2 U. S.] 210; [Fletcher v. Peck,] 6 Cranch, [10 U. S.] 135;) nor shall the general words of a law receive such a construction as to affect existing rights, (4 Burrows, 2462.) The right to regulate the public or common right of fishery gives no power to destroy it, or to grant an exclusive right to shore owners. The use of gilling nets may be prohibited as a matter of expediency, but the right to use them cannot be prohibited to the people generally, when it is granted to a particular class. If this mode of fishing is prejudicial to the public, it is equally so by whomsoever it is done. Though the general powers of the legislature are competent for all purposes of regulating fisheries within the state, yet they have no authority to give to riparian owners the right

claimed under the laws in question, nor to make it penal for the other inhabitants of the state to exercise a right secured to them by the common law and Magna Charta.

BALDWIN, Circuit Justice. Two questions are submitted to the court: 1. Whether under the laws of this state the defendant has a right to fish with a gilling seine or drift net in any part of the river Delaware, within the boundaries specified in the description of his fishery; 2. If he has not such right, whether these laws are constitutional.

The definition of a pool, or fishing place, in the third section of the act of 1808, which is still in force, enables us to ascertain the true object and meaning of the law in requiring every owner or possessor of a fishery on the Delaware, to describe his pool or fishing place according to the fourth section of the act of 1822. Connecting the proviso in the compact of 1783 with the third section of the law of 1808, and the fourth section of that of 1822, we can have no doubt of the meaning of the legislature in every part of the law. The compact authorizes the guarding of fisheries on the river annexed to the respective shores, against interruptions by persons fishing under claim of common right on the river; thus making a plain distinction between a fishery annexed to the shore, and a fishery by common right on the river. The words, fishery, pool, or fishing place, as defined in the act of 1808, can apply only to a place on the shore to which a fishery is annexed, and there can be no pool or fishery in reference to fishing by claim of common right on the river. A person thus fishing can be in no sense the owner or possessor of a fishery; there can be no pool or fishing place which is his by any other right than what is common to all the inhabitants of the state; it cannot be that fishery intended by the compact, and be guarded against the claim of common right, without placing both the compact and laws in direct contradiction with themselves. To a fishery by claim of common right there can be no locality of township or county—no beginning or ending point—the extent on the shore cannot be defined: the bond to be given is a security for infraction of the law "at such fishery" by command or permission of the owner or occupant of such fishery, by himself or tenant—and could never have been intended to be given by one fishing by common right. The recovery on the bond is contemplated to be against the owner, possessor, tenant or agent, and a penalty is imposed on any persons who shall fish in the fishery so entered, opposite the river shore included in the description, without the permission in writing of the person owning, possessing and entering the same; words which in their nature exclude claimants by common right, who cannot enter or describe

what they cannot own or occupy in their own right. The words of the law, the meaning of the legislature, are too plain to admit of a doubt; they can have no other application than to the owners of land on the shores of the river to which fisheries were annexed; they were bound to describe and enter their fisheries, and give their bond, according to law. By doing so they were secured in the exclusive right of fishery in their own pools, opposite their own lands, and acquired the right of using in front of their boundaries gilling seines or drift nets, which were prohibited by the fifth section of the act of 1808. To give any person any right under the law of 1822, or to avoid the penalties for using gilling seines, he must have, as owner or possessor, a fishery to enter. It would be nugatory to enter and describe what he neither owned, occupied, or claimed in his own or any derivative right. The case before the court affords as strong an illustration as could be made. The defendant lives in Philadelphia, he owns or claims no part of either shore of the river, which is owned by other persons; from whom he has no permission; yet he enters as his fishery a space of five miles, from Kensington to Fish's Point, comprehending both shores. A single observation suffices to show that this is not such a fishery as is contemplated by the law. If the defendant has a right of fishing within these boundaries, under these laws, he takes away the right of fishing opposite to ten miles of land on the shore from the owners, and enables him to sue them for penalties, if they fish within his boundaries. Such a pretension is too extravagant to be supported, and yet if it stops short of it, the provisions of the law cannot be complied with. The entry must give him exclusive rights within his boundaries, or it gives him none; and if he may so appropriate five miles on each shore, there can be no limits assigned to this fishery when he is no shore owner. It is clear then that the defendant is in no better situation by having made his entry than before. He had no antecedent right, and could acquire none by the mere forms he has pursued; they were evidently for the purpose of evading the laws of New Jersey, which applied only to riparian owners within the boundaries of their own fisheries, annexed to their land, and duly entered. Entertaining no doubt of the meaning and express provisions of the law, we have thought it better to express ourselves in general terms, than to found our opinion on any departure of the defendant's entry from the requisitions and forms of the law: being decidedly of opinion that he could not make an entry and description in any form or manner which could avail him, we have not entered into any examination of its particulars in description or otherwise. The case stated admitting that the defendant has made use of a gilling seine in the manner stated, he has directly violated the provisions of the fifth section of the act of 1808, and the seventh section of that of 1822, and is liable to the penalties imposed. He could not make the entry required by the fourth section, and therefore was not authorized under the sixth to use a gilling seine or drift net. This case then, in our opinion, is clearly within the law, and if the law is valid, our judgment must be for the plaintiff.

Sitting in the circuit court, we are bound to decide on the laws of a state precisely as we would if sitting in a state court. [Wilkinson v. Leland,] 2 Pet. [27 U. S.] 656. They are the rules of our decision, unless they are repugnant to the constitution, laws or treaties of the United States, which are the supreme law of the land, as well in the state as federal courts. Whether these laws are so repugnant, is the next object of our inquiry.

Questions of a similar nature have heretofore occurred in this state. The subject was very fully discussed in this court in the case of Corfield v. Coryell, [Case No. 3,230,] which depended on the validity of the laws regulating oyster fisheries, and was most thoroughly considered. It was contended in that case that the law was repugnant to the following clauses of the constitution of the United States: the eighth section of the first article, granting congress power to regulate commerce; to the second section of the fourth article, as to the privileges and immunities of citizens of one state in every other state; and the second section of the third article, extending the judicial power of the United States to all cases of admiralty and maritime jurisdiction. But the court decided, on great deliberation, that none of these provisions affected the validity of that law. The laws relating to the fisheries are open to the same objections, but they have not been distinctly presented to the court in the argument of this case. We have, however, thought proper to notice them, in order to express our entire assent both to the opinion and the reasoning of Judge Washington. The defendant's counsel have taken another objection to the validity of this law, which, though not directly contended to be founded on that provision of the constitution of the United States which declares that no state shall pass any law impairing the obligation of contracts, yet must come within it if the ground assumed is correct. They contend that, by the principles of the common law, there can be, neither by grant or prescription, a private right of fishery in an arm of the sea, a navigable river, or one in which the tide ebbs and flows; that the right of fishing in such waters is common to all the inhabitants of the state, and is expressly secured to them by a compact with the proprietaries of New Jersey in 1676; and that the legislature cannot prevent the exercise of that common right. Leaming & S. 390.

The charter of Charles II. to the Duke of York, bounded his grant by the Delaware river and bay, [Corfield v. Coryell, supra,] and comprehended no part of either; the grant from him to Lords Carteret and Barclay ran by the same boundaries, so that the claim of New Jersey to any part of the bay or river below low water mark, cannot be maintained by virtue of these grants. The charter to William Penn was bounded on the east by the Delaware, and included no part of the river, the right to the entire bed of which remained in the crown till the Revolution, though claimed by the proprietors of New Jersey from a very early period. 4 Wash. C. C. 385, 386. [Corfield v. Coryell, Case No. 3,230.] The rights of the crown being extinguished by the treaty of peace, those claimed by New Jersey to the river and bay were thereby confirmed, unless a better title should be found to exist in other states. But these rights accrued to the state in its sovereign capacity, and not to the proprietaries; they claiming only by grant, must be confined to its boundaries; an acquisition after its date could not pass under the charter to the proprietors; it was territory newly acquired, under the operation of the treaty, by New Jersey and Pennsylvania, and by them made the subject of the compact between the two states. It follows, then, that the proprietors in 1676 had no right of either property or fishery in the Delaware, to the common use of which they could grant a right to all the inhabitants of New Jersey; the crown alone could grant a common right of fishery beyond the bounds of the state. The king was no party to a compact made in derogation of his rights, which devolved on the state unimpaired by the unauthorized acts of the proprietors. The mere fact of their claiming beyond the limits of the charter could give them no title. Their compact in 1676 could create no right in the inhabitants which restrained or limited the exercise of the powers of sovereignty over the river, which the state derived from the paramount title of the crown. A compact between the proprietors and people of a state is a contract, the obligation of which cannot be impaired by a state law, but the one in question was without any obligatory force in giving the right of fishing in the Delaware. Its exercise under a claim from the proprietors, was an encroachment on the rights of the crown and the state. The compact was inoperative to confer any right such as is now claimed, although the present laws had never been passed. A repeal of the law would only save the penalty, and the defendant would be still without any right. This clause of the constitution then cannot avail him.

The constitution of this state, adopted the 2d of July, 1776, declares that the government of this province shall be vested in a governor, council, and a general assembly. There is no clause restricting the powers of the government as to the subjects of legislation; no part of it has been relied upon by the counsel of defendant as being inconsistent with their laws in relation to the fisheries in the Delaware; but they rest their alleged unconstitutionality on general principles. Congress have declared, in the 34th section of the judiciary act,—1 Story, 67, [1 Stat. 92,]—that the laws of the several states, except where the constitution, treaties or statutes of the United States shall otherwise require or provide, shall be regarded as rules of decision in trials of common law in the courts of the United States, in cases where they apply. In determining what is the law of New Jersey, we must look first to its constitution, which is a supreme law, binding on the legislature itself, and if it contained any restraint on the legislative power over fisheries, its obligation would be paramount, but as it contains none, the law which must govern our decision exists only in the acts of the government, organized by the people, under their constitution. We find its powers plenary, unrestrained, and brought into action by the acts under our consideration, which embrace the case submitted to us. We may think the powers conferred by the constitution of this state too great, or dangerous to the rights of the people, and that limitations are necessary, but we cannot affix them, or act on cases arising under state laws as if boundaries had been affixed by the constitution previously. We cannot declare a legislative act void because it conflicts with our opinions of policy, expediency or justice. We are not the guardians of the rights of the people of a state unless they are secured by some constitutional provision which comes within our judicial cognizance. The remedy for unwise or oppressive legislation, within constitutional bounds, is by an appeal to the justice and patriotism of the representatives of the people. If this fails, the people in their sovereign capacity can correct the evil; but courts cannot assume their rights. The supreme court have decided, (Satterlee v. Matthewson, 2 Pet. [27 U. S.] 412–414,) that a state law, though an unwise and unjust exercise of legislative power—retrospective in its operation—passed in the exercise of a judicial function—creating a contract between the parties to a pending suit where none existed previous to the law—declaring a contract in existence prior to the law, founded on an immoral or illegal consideration, to be valid and binding on the parties—or divesting rights which were previously vested in one of the parties—is neither ex post facto, a law impairing the obligation of contracts, or repugnant to the constitution of the United States. All the decisions of the federal courts, which have declared state laws void, have been founded on their collision with the constitution, laws, or treaties of the United States, or on the provisions of state constitutions, but not on the general principles as-

serted by the defendant's counsel. Were this court now to adopt them, we should disregard the high authority referred to, and submit state laws to a test as fallible and uncertain as all rules must be which have not their source in some certain and definite standard, which varies neither with times, circumstances or opinions. An ex post facto law is one which inflicts a punishment for doing an act innocent at the time of its commission. It is easy to ascertain whether a state law is within this provision. There can be no controversy about the definition of a contract, and if a state law does impair its obligation, it is clearly void. Though it is a very delicate, and has been found a very difficult matter to define the obligation of a contract, or the acts which do impair it; yet there is a fixed and certain standard to which they must be applied, and a definite rule by which to regulate their application. But there is no paramount and supreme law which defines the law of nature, or settles those great principles of legislation which are said to control state legislatures in the exercise of the powers conferred on them by the people in the constitution. If it is once admitted that there exists in this court a power to declare a state law void, which conflicts with no constitutional provision—if we assume the right to annul them for their supposed injustice, or oppressive operation, we become the makers and not the expounders of constitutions—our opinion will not be a judgment on what was the pre-existing law of the case, but on what it is after we shall have so amended and modified it as to meet our ideas of justice, policy and wise legislation, by a direct usurpation of legislative powers, and a flagrant violation of the duty enjoined on us by the judiciary act. It is therefore not material to the decision of this case, to examine further into the existence of a right of fishery in the Delaware, common to all the citizens of this state prior to the passage of the acts in question, since in our opinion the admission of such a right would not avail the defendant, it not being protected by any law paramount to those which have regulated or taken it away. A common law right to a common fishery in the Delaware, is to be enjoyed in subordination to the laws which regulate its use. It is a legitimate subject of legislation, and we cannot pronounce the law void because, in the exercise of an unbounded constitutional power, the government of New Jersey have restrained it within limits narrower than those allowed by common law, or common right. Neither do we think it necessary to examine into the extent of the rights of riparian owners in front of their lands. They undoubtedly had rights of fishery to a certain extent, under the colonial government, which were recognized by New Jersey and Pennsylvania, in the compact of 1783. It is admitted, that from a very early period of the history of the state, shore fisheries have been considered as private property, capable of being devised and alienated with or separate from the land to which they were annexed, subject to taxation, and taxed as other real estate. It is not pretended that there ever existed a common right of fishery in the citizens of the state, on or over the lands thus owned to low water mark; beyond it the states, since the treaty, are owners of the river in full sovereignty, to which no one could acquire any right but by some law or grant subsequent to its acquisition. The existence of such law or contract is not pretended, and it cannot be maintained as a legal proposition, that a mere permissive right of fishery is so solemn as to be incapable of restraint or regulation by the sovereign authority of a state. We can perceive nothing in those laws but the exercise of their legitimate power of sovereignty over its unquestionable domain. The legislature, for reasons of policy of which they are the sole judges, authorized the owners of those fisheries, who have complied with the conditions prescribed in the law, to use gilling seines or drift nets in the Delaware, opposite to their respective fisheries, and to prohibit the use of such seines or nets to all others, under such penalties as were thought sufficient to enforce its provisions. In thus enlarging the private, and restraining the common right of fishery, they have infringed no constitutional injunction; their acts are the law of the state; they apply to the case under our consideration, and we are bound to adopt them as the rule of our decision.

It is said that the case of Arnold v. Mundy, 1 Halst. [6 N. J. Law,] 1, etc., decided in the supreme court of this state, is in opposition to our opinion. We have carefully examined it, and find that the plaintiff claimed under no law of the state, but by virtue of an East Jersey proprietary warrant, surveyed in 1818, on ground covered by water in front of his land. The only question before the court was, whether by virtue of such warrant and survey he had an exclusive right to catch oysters in the water over the ground so surveyed. It was decided that he had not such right, and could not maintain trespass against the defendant, who claimed under common right.

At the time of this decision there was no law giving this exclusive right to the plaintiff, or imposing any restrictions on the defendant; the case depended on the common law of the state, and settled nothing more. The validity of no state law was in question before the court; that of 1822 had not been passed; there was therefore no connection between that case and this in any one principle. If the court, in pronouncing their judgment, or any judge in delivering his opinion, had declared by anticipation that a law like the present would be void, (1 Halst. [6 N. J. Law,] 78,) the declaration would in its nature be extra-judicial, and we could not consider it as a judicial exposition

of an existing law. The court, or the judge who gave it, would not be bound by such opinion when the validity of the law came before them judicially; still less could a court of the United States regard it as of any other authority than the opinion of learned and highly respectable judges, on a case not before them. It is a rule of the supreme court, from which it would depart only under very peculiar circumstances, to adopt the decisions of state courts on the construction and validity of local statutes, and the exposition of local common law, but they could not extend this rule to declarations of courts or judges which were not authority even in the courts in which they were made. This court is authoritatively bound by the decision of the supreme court of the United States, but it is only by such as are judicially made. The opinion which would be given on a matter which neither was, nor could be, before them, would be entitled to all possible respect, but would be no authority to control our judgment. It cannot be expected of us to yield a greater deference to what fell from any of the respected judges in the case of Arnold v. Mundy, than to similar expressions from one or more of the judges of the supreme court of the United States. [Satterlee v. Matthewson,] 2 Pet. [27 U. S.] 413.

Judgment must be rendered for the plaintiff.