# IN THE SUPREME COURT OF IOWA

No. 18–0737

Filed December 20, 2019

**MICHAEL THOMAS GOODWIN,**

Plaintiff,

vs.

**IOWA DISTRICT COURT FOR DAVIS COUNTY,**

Defendant.

---

Certiorari to the Iowa District Court for Davis County, Joel D. Yates, Judge.

Juvenile offender challenges the district court's denial of his motion to correct an illegal sentence. **WRIT ANNULLED; DISTRICT COURT RULING AND SENTENCE AFFIRMED.**

Martha J. Lucey, Assistant Appellate Defender, for plaintiff.

Thomas J. Miller, Attorney General, Louis S. Sloven, Assistant Attorney General, Rick L. Lynch, County Attorney, and Douglas D. Hammerand, Assistant Attorney General, for defendant.

**WATERMAN, Justice.**

In this appeal, we must decide whether a motion to correct an illegal sentence is a proper vehicle to challenge a mandatory minimum term of imprisonment on grounds alleging the sentencing court failed to correctly apply our precedent governing juvenile sentencings. A sixteen-year-old fatally shot his father and pled guilty to second-degree murder under a plea agreement to jointly recommend a twenty-year mandatory minimum. The district court conducted his individualized sentencing hearing after our decision in *State v. Roby*, 897 N.W.2d 127, 145–47 (Iowa 2017), which elaborated on the juvenile sentencing factors set forth in *Miller v. Alabama*, 567 U.S. 460, 477–78, 132 S. Ct. 2455, 2468 (2012), and *State v. Lyle*, 854 N.W.2d 378, 404 n.10 (Iowa 2014). The district court, relying on expert testimony, imposed a fifty-year prison sentence with a twenty-year mandatory minimum before parole eligibility, consistent with the parties' plea agreement, and recited its consideration of the sentencing factors. The defendant filed no direct appeal. Months later, the defendant filed a pro se motion in district court to correct an "illegal" sentence and for appointment of counsel, alleging the district court had failed to properly apply the *Miller/Lyle/Roby* factors. The district court denied his motion. We granted the defendant's petition for a writ of certiorari.

On our review, we hold that a motion claiming the district court *misapplied* the *Miller/Lyle/Roby* factors does not constitute a challenge to an *illegal* sentence with a concomitant statutory right to counsel. A failure to conduct an individualized hearing before imposing a mandatory minimum sentence would render a juvenile's sentence unconstitutional and subject to a challenge as an illegal sentence. This defendant, however, received an individualized sentencing hearing that addressed the

*Miller/Lyle/Roby* factors. Accordingly, we annul the writ and affirm the district court's ruling and sentence.

## I. Background Facts and Proceedings.

On December 11, 2015, sixteen-year-old Michael Goodwin Jr. fatally shot his father, Michael Goodwin Sr.[1] twice in the head while the father rested in a recliner in their living room. The son walked out without reporting the crime and spent the night at his ex-girlfriend's house, telling her his father left town and he was locked out.

Goodwin had access to his grandfather's home and truck. His grandfather was hospitalized at that time. Goodwin drove the truck to his ex-girlfriend's home with his family dog, dog food, clothing, and two firearms. She found his house keys in the truck the next day when he picked her up from work, contradicting his claim that he was locked out. They attended a school dance separately that evening, December 12. There, he coerced her into leaving the dance with him by telling her if she did not get into the truck with him he would hurt her boyfriend and "it would not end well." Goodwin drove her to his grandfather's house where he took the firearms inside. Her boyfriend picked her up there despite Goodwin's refusal to let her leave, which infuriated Goodwin. She reported this incident to law enforcement that evening. Deputies detained Goodwin and brought him to the emergency room for a mental health evaluation based on the suicidal and homicidal statements he had made to his ex-girlfriend. Goodwin was transferred to a juvenile detention center.

On December 13, Goodwin Sr.'s best friend, Rodney Stevens, visited his house to check on him after he missed a church event and failed to answer phone calls. Stevens was concerned about Goodwin Sr.'s safety

---

[1]We will refer to the father as "Goodwin Sr." and the son as "Goodwin" throughout this opinion.

given his strained relationship with his son. Upon arriving at the Goodwin home, he smelled "death" and called law enforcement requesting a wellness check. Davis County Deputy Robert Murry found Goodwin Sr. dead in his reclining chair in the living room. The television was on, his cell phone was in his lap, and his drink was undisturbed on the table next to the recliner. The lead investigator, Chief Deputy Josh O'Dell, stated there was no sign of a struggle, and it appeared that Goodwin Sr. "was basically reclined in that chair like he'd been laying down watching TV."

Investigators found the murder weapon, a Ruger 22/45 .22-caliber pistol, in the basement rafters of the grandfather's home. They concluded Goodwin had killed his father and had acted alone. They found no evidence of peer pressure to commit this crime. They were unable to determine a motive but believed Goodwin violently overreacted to his father's refusal to allow him to attend that Saturday's school dance.

On January 25, 2016, Goodwin was charged with first-degree murder. This was not his first contact with law enforcement or the judicial system. Since April 2012, Goodwin had been referred to juvenile court services three times for the offenses of simple assault, disorderly conduct (fighting in public), and two counts of carrying weapons. He successfully completed the terms of informal adjustment agreements for the simple assault and disorderly conduct offenses. The weapons charges stemmed from the events on December 12, 2015, and were pending at the time of his arrest for his father's murder.

On April 28, 2017, Goodwin pled guilty pursuant to a plea agreement under which the parties agreed to jointly recommend a sentence with a mandatory minimum of twenty years before parole eligibility and a fifty-year maximum. At the plea hearing, Goodwin admitted that before the murder he argued with his father and went

outside to blow off steam by shooting a handgun. When he came back inside, the argument continued, and he impulsively shot his father in the head twice from six to eight feet away. The court accepted his guilty plea.

The court conducted his sentencing hearing on July 19. Goodwin was then age seventeen. The prosecutor began the sentencing hearing by stating,

> Your Honor, based on the recent case that came down from the Iowa Supreme Court, *State v. Christopher Roby*, R-o-b-y -- it was filed on June 16, 2017 -- the Supreme Court of Iowa went through the additional five factors that were identified in *Lyle* and explained what we should do to establish a record. The defense is going to be calling an expert, and the State is using that expert as well to establish why we're having a 20-year minimum in this case.

The State called two witnesses: Chief Deputy O'Dell and Stevens. O'Dell testified about the murder scene, including the absence of evidence of a struggle, and Goodwin's activities.

Stevens testified about Goodwin's childhood, family circumstances, and behavior preceding the patricide. Stevens noted that Goodwin's parents had divorced five or six years earlier and that Goodwin initially lived with his mother. He wanted to live with his father, and he acted out and caused problems for his mother to get his way. After a few months, his mother consented to his move and terminated her parental rights. Goodwin moved in with his father. Neither parent provided much discipline, and the father had only begun to establish ground rules shortly before the murder. The grandfather spoiled Goodwin and gave him two firearms without the father's knowledge, texting, "Bubba, whatever you do, don't let your dad know I gave you those two guns." Stevens witnessed Goodwin threaten his father.

Stevens additionally observed that the son's attitude was frequently "belligerent" towards his father and others, with a "you don't tell me what

to do" attitude. Stevens was concerned enough that he told Goodwin Sr. that he was worried his son would get access to a firearm and shoot him, but the father replied that his son had no such access.

The defense called an expert witness, Dr. Stephen Hart, at the sentencing hearing. Dr. Hart, a professor of clinical and forensic psychology, relied on transcripts of depositions and his personal interview of Goodwin. Dr. Hart described Goodwin's childhood:

> Michael's childhood was rather disturbed or disrupted. Early on, from his description and the description of others, there were times when the family was relatively normal or that he had a relatively normal childhood. He was described as being happy but also being able to go out and play outside the home and play with friends and so forth.

> But later on, there was some serious problems due to his father's alcohol abuse and anger and his general abusiveness, psychological and physical abusiveness -- and this led to some very serious marital discord between the parents over a long period of time, many years, and that included frequent arguments in the house, yelling and screaming or shouting, and also physical abusiveness between the parents, some of which was witnessed by -- directly by Michael.

> His mother was quite fearful, in part, because Mr. Goodwin, Sr. was a large man, and eventually she separated and moved away, essentially just leaving Michael Jr. in the custody of Michael Sr. -- and I'm going to use the term advisedly -- abandoning him or leaving him there and basically cutting off contact with him.

Dr. Hart then described the situation between Goodwin and his father after his mother relinquished her parental rights:

> The situation was bettered in some ways in a sense that Michael Sr.'s alcohol problems, which had been bad and then had improved. He'd gone through a period of sobriety. He restarted drinking again around the time of the final separation, but then did regain his sobriety. So that was a positive thing. And there was also indication that he began to attend church more frequently and establish some stronger friendships.

> However, he also seemed to become, in some ways, more angry and also somewhat more extreme or entrenched

in his attitudes. And, in particular, there's very extensive descriptions of his prepper beliefs and behavior. He was one of the people that believed there was a strong need to prepare for an imminent catastrophe, and he stockpiled food and weapons and other supplies and met regularly with people who shared his prepper beliefs, withdrew from many other members of society or restricted his social contact. He put cameras around the family home.

He restricted Michael Jr. from having contact with people outside the home. For example, he wasn't allowed to socialize with friends outside of school or go out in the evenings.

He spoke a lot about his prepper beliefs and also more general suspicious or cynical and antiauthority attitudes, including antigovernment and antipolice attitudes. He was focused on firearms use and taught Michael Jr. to use firearms and made him responsible as far as part of their care and maintenance in the family home.

But he also, towards Michael Jr., became angry and abusive directly, often yelling at him, or frequently yelling at him, and occasionally hitting him. And on a few occasions was described by Michael Jr. as beating him and even pointing handguns at him. And Michael Jr. also became concerned that this abusive behavior was increasing in severity over time. He actually mentioned this to some other people, but did not report it to police.

Dr. Hart elaborated about Goodwin's cognitive and intellectual functions and opined he was "a relatively normal or grossly normal adolescent male" with "average intelligence and no major cognitive deficits." Dr. Hart diagnosed Goodwin with attention deficit disorder for which he never received treatment. Dr. Hart noted that he did not consider that diagnosis to be serious since it is fairly common among children, especially young males. He explained,

His personality functions appeared to be grossly normal. In particular, I didn't notice any kind of marked personality traits that were of the type or of the severity that might indicate a serious personality disturbance or a burgeoning personality disorder.

He clearly has had some problems over the years with anger and impulsive or reactive aggression. However, again, most of that, aside from the current offense, was not serious in nature or frequent. I would say relatively normal, perhaps

above average, but not extreme for an adolescent male. His social or personal relationships are grossly normal. He had some good social skills. He is a relatively polite or pleasant young man, and he's had some positive peer relationships over the years, and even some intimate relationships, all of this despite the fact that he's had a restricted social life through the problems with his father.

He also has started to re-establish a relationship with his mother over the years.

Finally, his social attitudes or orientation were, again, grossly normal. He acknowledges that he's, kind of, mildly suspicious of others at times. He's a little bit anxious around other people, in part because of being restricted in terms of his ability to have interaction with other people and maybe being a little bit suspicious of others on account of his father's beliefs.

But he's, again, primarily prosocial in nature and a polite, respectful young man. By no means perfect, and never presented himself as such, but I would have said pretty normal for an adolescent male. He had no serious problems with alcohol use. He did use alcohol, but there was no evidence of significant or serious problems. He did not use drugs. He did not have serious or frequent antisocial conduct in the community prior to the current offense. He had no serious behavioral problems with school or institutional infractions while in custody in relation to this current offense.

But even in terms of thoughts or plans for the future, these were primarily prosocial in nature. His, kind of, long-term dream was to maybe join the Army and then seek a career in law enforcement or something similar, which is somewhat unusual for the people I have evaluated.

Regarding Goodwin's maturity and responsibility, Dr. Hart found him to be "a, kind of, normal adolescent male" with "occasional problems with anger and what [he] would call impulsive or reactive aggression, but [he] would have characterized that as being related to his adverse child-rearing experiences or other situational factors as opposed to some kind of developmental problem."

Dr. Hart characterized Goodwin's home environment and family relationships as being "seriously disturbed" and "quite poisonous in a sense -- or toxic in a sense of being something that [he] would have expected to have an adverse impact on any young person." He elaborated,

Certainly being stuck alone with his father, he was, in some ways, almost a captive in an environment that was extremely negative and focused on anger and aggression and violence and guns. And he was directly exposed to this to the point where he was physically abused by his father and had guns pointed at him. This was just, I think by anybody's definition, a bad home environment.

When he was asked to give an opinion on Goodwin's legal competency, Dr. Hart stated,

I believe that he was, again, a pretty normal adolescent male and did not have any significant problems with legal competency. So, in particular, what I paid attention to was whether he seemed to ever have failed to appreciate the nature or object of potential consequences of the offense for which he was arrested and charged.

I considered whether he appeared to have been subjected to any intense investigative procedures by the police or whether he was -- he appeared to have problems communicating with or instructing counsel, and from the information I reviewed and my conversations with him, I didn't see any potential problems in these areas.

Dr. Hart described Goodwin's prospects for rehabilitation as "very good or excellent" due to his identification of a number of strengths in Goodwin's development and psychological and social functioning, and Dr. Hart did not see many areas of weakness except his childhood experiences and his relationship with his father. He concluded that Goodwin can likely "understand and abide by institutional rules and regulations" such that it is unlikely that he will be unable to adjust to incarceration. Dr. Hart found that Goodwin's level of functioning and social skills suggested that he would be able to participate in and benefit from rehabilitative activities such as counseling and vocational programs. He concluded that he did not see anything that suggested Goodwin posed an elevated risk for violence.

Finally, while still under direct examination by defense counsel, when asked about the sentence length in the plea agreement, Dr. Hart

testified that he thought the minimum period of incarceration was appropriate and that it would adequately protect public safety. On cross-examination, the prosecutor questioned Dr. Hart regarding some details in his report, his consideration of the *Miller/Lyle/Roby* factors, and the conclusions he reached for each factor:

> Q. The final thing I want to ask you, Dr. Hart, is in your report you indicated you followed the five factors, and you talked about the recent Iowa Supreme Court *State v. Roby.* A. That's correct.
>
> Q. You had a chance to read that as well? A. I was able to review part of it, yes. I haven't reviewed it in detail -- or, sorry, completely -- but I reviewed the sections that had to do with the description of the criteria that ought to be considered.
>
> Q. Sure. And I think Mr. Addington went through at least four of those factors with you on direct examination, and I just want to cover one that wasn't covered. In the *Roby* case, they talk about a third factor called "the circumstances of the crime." And what the Court was concerned about is, within these circumstances, attention must be given to the juvenile offender's actual role and the role of various types of external pressure in the crime.
>
> So I just want -- so it's clear for the record, Dr. Hart, you didn't find any type of group pressure being placed on the defendant involving the shooting in this case? In other words, he wasn't hanging around with friends and they talked about committing this crime or anything; is that correct? A. That's correct. In fact, the only things that I noted in this respect were that -- relevant to this particular criteria was that the actual offense itself occurred in the midst of a serious conflict between the two Michaels, Junior and Senior.
>
> Q. Well, that's according to Michael Jr.; correct? A. That's correct. But the other element of that particular criteria did not appear to be applicable to me in this case.

The prosecutor concluded his cross-examination by asking for Dr. Hart's opinion about the twenty-year mandatory minimum sentence:

> Q. Okay. So the bottom line is you considered those five factors set out in *State v. Roby,* and after considering those factors, reviewing documents in this case, talking to the defendant, *it's your opinion that the 20-year mandatory minimum is appropriate for a minimum sentence in this case*?

A. *Yes.* And just to follow up on your question, not only did I do my best to consider what was explicitly included as criteria in the *Roby* case and prior cases, I've always tried to go beyond that to look at related kinds of issues. So I tried to use that as a starting point, but I tried to be more broad or individualized or contextualized in the assessment and found nothing else that appeared to be relevant.

(Emphasis added.)

Goodwin testified on his own behalf. He detailed his family relationships, his parents' divorce when he was age ten or eleven, and how he thought the best thing for him was to live with his father after the divorce. He noted things slowly changed for the worse because he was limited to mostly staying at home with his father and Stevens. Goodwin described how he was unable to invite friends to his home or date because their church opposed teens dating. He said he faced increasing verbal abuse from his father. Goodwin explained that they argued over "little stuff," and he would seek refuge with his grandfather, which escalated tensions with his father.

Goodwin testified at times they "got physical and [would] fight." He noted that there were handguns and rifles in the home that he knew how to use. He described his father's prepper behaviors and distrust of government and the police, attitudes he shared. He stated that he could not tell anyone other than close friends about his unhappiness, and the only thing that relieved his stress was going to his grandfather's, which he was unable to do in December while his grandfather was hospitalized. On cross-examination, Goodwin testified that he was able to communicate with and form friendships with girls through hidden activities or on his iPhone despite the limitations imposed by his father and the church, but doing so increased the conflict with his father.

The court sentenced Goodwin to a fifty-year prison term with a twenty-year minimum before parole eligibility, consistent with the plea agreement. The court gave these reasons for the sentence:

> Mr. Goodwin, I've selected this particular sentence for you after considering your age, specifically your age at the time the crime was committed, the nature of the offense committed by you and the harm to the victim, the plea agreement reached by the attorneys in this case, the contents of the PSI, and specifically the recommendation of the PSI.
>
> I've also considered what the witnesses have testified to here today. I have also considered the factors set forth in *State v. Roby*. I've also considered your need for rehabilitation and your potential for rehabilitation. And, finally, I've considered the necessity for protecting the community from further offenses by you and others.

Goodwin filed a motion for reconsideration of his sentence on October 30, which the district court denied. Goodwin did not file a direct appeal.

On March 28, 2018, Goodwin filed a pro se motion to correct an illegal sentence and for appointment of counsel, asserting,

> [t]he court failed to properly weigh the factors cited in State v. Roby, 897 N.W.2d 127 (Iowa 2017), and failed to consider any expert testimony determining those factors, as well as other evidence and testimony that the defendant cannot be sentenced to any mandatory-minimum sentence without violating both the Iowa and U.S. Constitutions.

On April 27, the district court denied this motion. Goodwin filed a pro se petition for writ of certiorari, which we granted. The state appellate defender was appointed to represent him. We retained the case.

## II. Standard of Review.

"[W]e may review a challenge that a sentence is illegal at any time." *Jefferson v. Iowa Dist. Ct.*, 926 N.W.2d 519, 522 (Iowa 2019) (quoting *State v. Zarate*, 908 N.W.2d 831, 840 (Iowa 2018)). "[T]hough we typically review challenges to illegal sentences for correction of legal errors, our standard

of review for an allegation of an unconstitutional sentence is de novo." *Id.* (quoting *State v. Harrison*, 914 N.W.2d 178, 187–88 (Iowa 2018)).

### III. Analysis.

Goodwin's pro se motion to correct an illegal sentence alleged the district court failed to properly weigh the *Roby* factors.[2] The State argues that his claim is a procedural challenge that was improperly brought through a motion to correct an illegal sentence. We must decide whether Goodwin's challenge to his sentence on these grounds constitutes an attack on an *illegal* sentence, and we conclude it does not.

In *Jefferson,* we recognized a statutory right to counsel under Iowa Rule of Criminal Procedure 2.28(1) to represent the defendant on a proper motion to correct an illegal sentence. 926 N.W.2d at 520, 525. We recognized that "the motion to correct an illegal sentence has the potential to be abused." *Id.* at 525. We carefully reiterated what is, and what is not, a proper motion to correct an illegal sentence. "To begin with, a motion challenging a defendant's underlying conviction is *not* a motion to correct an illegal sentence." *Id.* The purpose of a motion to correct an illegal sentence is "not to re-examine errors occurring at the trial or other

---

[2]It is not our role to rewrite a pro se pleading, nor can we act as the advocate for a pro se litigant. *State v. Piper*, 663 N.W.2d 894, 913–14 (Iowa 2003) (noting that consideration of the defendant's claims not fully raised or analyzed in his appeal "would require the court 'to assume a partisan role and undertake the [defendant's] research and advocacy,' a task we will not accept" (alteration in original) (quoting *State v. Stoen*, 596 N.W.2d 504, 507 (Iowa 1999))), *overruled on other grounds by State v. Hanes*, 790 N.W.2d 545, 551 (Iowa 2010); *see also Conkey v. Hoak Motors, Inc.*, 637 N.W.2d 170, 173 (Iowa 2001) ("As a pro se plaintiff, Conkey undertook responsibility for litigating his own cause. No part of that obligation devolved upon the court."). Accordingly, we will not construe Goodwin's district court filing as a *Bruegger* claim that Goodwin's sentence is unconstitutional as grossly disproportionate to the crime he committed. *See State v. Bruegger*, 773 N.W.2d 862, 884–85 (Iowa 2009); *see also State v. Oliver*, 812 N.W.2d 636, 650–52 (Iowa 2012) (discussing application of *Bruegger*). Even if read liberally, Goodwin's pro se motion does not present a claim for an illegal sentence. In any event, Goodwin's highly capable appellate counsel has not argued that Goodwin's pro se district court filing can be construed to raise a *Bruegger* claim.

proceedings prior to the imposition of the sentence." *State v. Bruegger*, 773 N.W.2d 862, 871–72 (Iowa 2009) (quoting *Hill v. United States*, 368 U.S. 424, 430, 82 S. Ct. 468, 472 (1962)). "Additionally, 'a defective sentencing procedure does not constitute an illegal sentence . . . .' " *Jefferson*, 926 N.W.2d at 525 (quoting *Tindell v. State*, 629 N.W.2d 357, 360 (Iowa 2001)). A motion to correct an illegal sentence cannot be brought to challenge "sentences that, because of procedural errors, are illegally *imposed.*" *Tindell*, 629 N.W.2d at 359. Accordingly, the failure to conduct a reasonable-ability-to-pay determination before imposing a restitution award does not make the award "illegal" or subject to challenge at any time through a motion to correct an illegal sentence. *State v. Gross*, ___ N.W.2d ___, ___ (Iowa 2019) ("Instead, as we have previously held, once the deadline for direct appeal has run, the defendant is limited to filing a petition to modify restitution (or the plan of restitution) under Iowa Code section 910.7.").

Labels are not controlling. Counsel need not be appointed merely because the defendant files a challenge captioned as a "motion to correct an illegal sentence." And if a motion to correct an illegal sentence is frivolous, appointed counsel "may ask to withdraw employing a procedure similar to that authorized by [Iowa Rule of Appellate Procedure] 6.1005 for frivolous appeals." *Jefferson*, 926 N.W.2d at 525.

A proper motion to challenge an illegal sentence "includes claims that the court lacked the power to impose the sentence . . . , including claims that the sentence is outside the statutory bounds or that the sentence itself is unconstitutional." *Bruegger*, 773 N.W.2d at 871.[3] For example, in *State v. Lathrop*, we held that the defendant properly brought

---

[3]The briefing by Goodwin's appellate counsel does not present a *Bruegger* claim.

a motion to correct an illegal sentence to challenge his sentence to lifetime parole as unconstitutional under the ex post facto clause of the Iowa Constitution. 781 N.W.2d 288, 294 (Iowa 2010); *see also* Iowa Const. art. I, § 21.

Regarding sentences for juvenile offenders, "we have held it is the 'absence of a sentencing procedure' that offends article I, section 17 of the Iowa Constitution. Thus, when there is an appropriate sentencing procedure there is no constitutional violation." *Roby*, 897 N.W.2d at 137 (quoting *Lyle*, 854 N.W.2d at 402). Goodwin would have a proper motion to correct an illegal sentence if he had been denied an individualized sentencing hearing. But "if the district court follows the sentencing procedure we have identified and a statute authorizes the sentence ultimately imposed, then our review is for abuse of discretion; we ask whether there is 'evidence [that] supports the sentence.'" *Id.* (alteration in original) (quoting *State v. Seats*, 865 N.W.2d 545, 553 (Iowa 2015)).

We hold that the district court had the constitutional authority to impose Goodwin's twenty-year mandatory minimum sentence because it conducted an individualized sentencing hearing that applied the *Miller/Lyle/Roby* factors. The Iowa Constitution permits mandatory minimum sentences for juvenile offenders after an individualized hearing applying those factors. *Roby*, 897 N.W.2d at 132, 145. Indeed, " '[i]f the mandatory minimum period of incarceration is warranted,' we commanded [our judges] to impose the sentence." *Id.* at 143 (alteration in original) (quoting *Lyle*, 854 N.W.2d at 404 n.10).

Goodwin challenges whether the district court properly weighed the *Miller/Lyle/Roby* factors and expert testimony during that hearing. In our view, Goodwin's claims allege a defective sentencing procedure, not an illegal sentence beyond the court's authority. *See State v. Ayers*, 590

N.W.2d 25, 27 (Iowa 1999) ("We consider the court's failure to exercise its discretion a defective sentencing procedure . . . ."). A contrary holding would allow parties to misuse motions to correct an illegal sentence to bring untimely appeals that in substance challenge how the district court exercised its discretion in sentencing. We will not permit such collateral attacks on a sentence.

Even if we were reviewing Goodwin's sentence on direct appeal, we would determine the district court acted within its discretion and affirm. In our view, this record shows Goodwin received the requisite individualized sentencing hearing addressing the *Miller/Lyle/Roby* factors, which are

> (1) the age of the offender and the features of youthful behavior, such as "immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) the particular "family and home environment" that surround the youth; (3) the circumstances of the particular crime and all circumstances relating to youth that may have played a role in the commission of the crime; (4) the challenges for youthful offenders in navigating through the criminal process; and (5) the possibility of rehabilitation and the capacity for change.

*Lyle*, 854 N.W.2d at 404 n.10 (quoting *Miller*, 567 U.S. at 477–78, 132 S. Ct. at 2468); *see also Roby*, 897 N.W.2d at 135 (quoting same factors).[4] In *Roby*, we emphasized the importance of expert testimony. 897 N.W.2d at 145–48. Each factor was addressed by the expert in Goodwin's sentencing hearing.

---

[4]The State argues *Roby* erroneously "outsources" sentencing discretion in applying the youth factors from judges to experts, but it stops short of asking us to overrule *Roby* or *Lyle*. "We do not ordinarily overrule our precedent sua sponte." *Estate of McFarlin v. State*, 881 N.W.2d 51, 59 (Iowa 2016); *see also State v. Roberson*, No. 2017AP1894–CR, 2019 WL 6518531, at *13 (Wis. Dec. 3, 2019) (overruling precedent at state's request to "return to our past practice of following decisions of the United States Supreme Court").

Under the first factor, the sentencing court must consider "the age of the offender and the features of youthful behavior, such as 'immaturity, impetuosity, and failure to appreciate risks and consequences.' " *Lyle*, 854 N.W.2d at 404 n.10 (quoting *Miller*, 567 U.S. at 477–78, 132 S. Ct. at 2468). Recognizing that children and adults constitutionally differ, the court considers evidence that "speaks to the juvenile's 'maturity, deliberation of thought, and appreciation of risk-taking.' " *Zarate*, 908 N.W.2d at 852 (quoting *Roby*, 897 N.W.2d at 145). Dr. Hart testified that Goodwin was "a relatively normal or grossly normal adolescent male" with "average intelligence and no major cognitive deficits," some problems with anger and impulsive or reactive aggression that he believed could be attributed to his childhood or other situational factors, and good social skills with positive peer relationships despite the social restrictions. Although he noted that Goodwin had a history of attention deficit disorder, he did not notice any personality traits that could indicate a serious personality disturbance or a burgeoning personality disorder. Dr. Hart described Goodwin as "pretty normal for an adolescent male" without a history of antisocial conduct in the community, behavioral problems at school, or institutional infractions while in custody. Stevens's testimony contradicts Dr. Hart in part, characterizing Goodwin as having a "belligerent" and "you don't tell me what to do" attitude toward others, including his father. Stevens also expressed concerns for his own safety and Goodwin Sr.'s.

Under the second factor, the sentencing court must consider "the particular 'family and home environment' that surround the youth." *Lyle*, 854 N.W.2d at 404 n.10 (quoting *Miller*, 567 U.S. at 477–78, 132 S. Ct. at 2468). "This factor seeks to identify any familial dependency and negative influences of family circumstances that can be ingrained on children" and

considers the impact of all home environments, financial situations, and social backgrounds. *Roby*, 897 N.W.2d at 146. Dr. Hart testified that Goodwin's childhood was initially "relatively normal" but changed with the marital discord that led to his parents' divorce, which included abuse and frequent arguments that he witnessed. Dr. Hart noted Goodwin's mother relinquished her parental rights and subsequently had only infrequent contact with him. After the divorce, Goodwin Sr. went through a period of sobriety and began attending church and meetings regarding his "prepper beliefs," which led to him restricting his son's social life with girls. Dr. Hart additionally testified that Goodwin faced physical and emotional abuse by his father. Dr. Hart discussed how Goodwin was exposed to firearms and was responsible for their care and maintenance in the home. Overall, Dr. Hart testified that Goodwin's home environment and family relationships were seriously disturbed and poisonous.

Under the third factor, the sentencing court must consider "the circumstances of the particular crime and all circumstances relating to youth that may have played a role in the commission of the crime." *Lyle*, 854 N.W.2d at 404 n.10. Here, our caselaw directs the sentencing judge to give attention to "the juvenile offender's actual role and the role of various types of external pressure." *Roby*, 897 N.W.2d at 146. As such, this factor is more relevant in situations of group participation in a crime. *Id.* For homicide offenses, this also involves consideration of "the way familial and peer pressures" may have affected the defendant. *Zarate*, 908 N.W.2d at 853 (quoting *Seats*, 865 N.W.2d at 556). When directly asked about this factor, Dr. Hart answered that there was no evidence of peer pressure on Goodwin to kill his father. Dr. Hart acknowledged that Goodwin killed his father during an argument. Nevertheless, the physical murder scene, described during the sentencing hearing by the lead

investigator, belied any indication of a struggle. Goodwin Sr. was shot dead in his recliner while watching TV with his remote and drink at his side. No claim of self-defense was raised. Our sentencing courts can and should consider the heinous nature of the crime in evaluating whether to impose a mandatory minimum sentence.

Under the fourth factor, the sentencing court must consider "the challenges for youthful offenders in navigating through the criminal process." *Lyle*, 854 N.W.2d at 404 n.10. This factor recognizes that juveniles are typically less capable than adults at navigating the legal process. *Roby*, 897 N.W.2d at 146. Dr. Hart stated that Goodwin was a "pretty normal adolescent male" that "did not have any significant problems with legal competency." He testified that he did not see any potential problems regarding Goodwin Jr.'s interactions with the police or his legal counsel.

Under the fifth factor, the sentencing court must consider "the possibility of rehabilitation and the capacity for change." *Lyle*, 854 N.W.2d at 404 n.10. This factor typically favors mitigation because juveniles are generally more capable of rehabilitation than adults. *Roby*, 897 N.W.2d at 147. Dr. Hart testified that Goodwin's prospects for rehabilitation were "very good or excellent," given that he saw "strengths" in his development and psychological and social functioning that suggested potential for change. Dr. Hart identified Goodwin's areas of weakness as being his childhood experiences and his strained relationship with his father but believed he would adjust to incarceration and would benefit from the rehabilitative programs available there.

The district court heard Dr. Hart's detailed expert testimony on his consideration of Goodwin's individual situation under all of the factors. The court also explicitly stated it "considered the factors set forth in *State*

*v. Roby*" in reaching its sentencing determination. We determine that Goodwin received the requisite individualized sentencing hearing, which satisfied the constitutional requirement from article I, section 17 of the Iowa Constitution.

The district court also had the statutory authority to impose this sentence. Goodwin was convicted of second-degree murder. The maximum sentence for an adult individual convicted of second-degree murder is fifty years. Iowa Code § 707.3(2) (2016). Under section 902.12(1), thirty-five of those fifty years must be served before the individual is eligible for parole or work release. *Id.* § 902.12(1). Section 901.5(14) allows the court to "suspend the sentence in whole or in part, including any mandatory minimum sentence" when sentencing juveniles. *Id.* § 901.5(14). The district court sentenced Goodwin to a minimum of twenty years of imprisonment before parole eligibility and a fifty-year maximum for his crime of second-degree murder. The court had the authority to impose a fifty-year sentence under section 707.3(2), and it was not required to impose a lower mandatory minimum term than what is mandated in section 902.12(1) merely because Goodwin was a juvenile. *See id.* § 901.5(14). Our district courts can and should weigh public safety (incapacitation), deterrence, and retribution when sentencing juvenile offenders for violent felonies. *See Zarate*, 908 N.W.2d at 854–55 (approving consideration of other goals of criminal punishment when sentencing juvenile offenders, including incapacitation, deterrence, and culpability).

Goodwin fails to show the district court lacked the statutory authority to impose this sentence. To the contrary, his sentence was within the statutory limits. In fact, Goodwin received a more lenient sentence than the maximum authorized by the statute, a thirty-five-year

mandatory minimum. Goodwin will become parole eligible before age thirty-nine, his father's age at the time of his murder.

The district court acted within its constitutional and statutory authority in sentencing Goodwin to the twenty-year mandatory minimum. We therefore reject Goodwin's claim that his sentence is illegal.

The district court adequately explained its reasons for the sentence:

> Mr. Goodwin, I've selected this particular sentence for you after considering your age, specifically your age at the time the crime was committed, the nature of the offense committed by you and the harm to the victim, the plea agreement reached by the attorneys in this case, the contents of the PSI, and specifically the recommendation of the PSI.
>
> I've also considered what the witnesses have testified to here today. I have also considered the factors set forth in *State v. Roby.* I've also considered your need for rehabilitation and your potential for rehabilitation. And, finally, I've considered the necessity for protecting the community from further offenses by you and others.

The district court relied on no impermissible sentencing factors. The expert testimony of Dr. Hart, who was retained by the defense, supported the twenty-year mandatory minimum sentence. That sentence is also supported by the parties' plea agreement and joint recommendation. *See State v. Cason*, 532 N.W.2d 755, 756–57 (Iowa 1995) (per curiam) (recognizing that sentencing courts may consider the parties' plea agreement in imposing the sentence). Neither Goodwin nor his appellate counsel argues his trial counsel was ineffective. To the contrary, with the aid of his trial counsel, Goodwin avoided a longer mandatory minimum sentence and a first-degree murder conviction. As required by our precedent, the district court independently considered the other sentencing factors along with the plea agreement to ensure the sentence imposed was constitutional.

The absence of additional specific findings on each factor does not make this an illegal sentence. Even a "terse and succinct statement is sufficient . . . when the reasons for the exercise of discretion are obvious in light of the statement and the record before the court." *State v. Thacker,* 862 N.W.2d 402, 408 (Iowa 2015); *see also State v. Victor,* 310 N.W.2d 201, 205 (Iowa 1981) (holding that the requirement to state reasons for the sentence was satisfied because "it is clear from the trial court's statement exactly what motivated and prompted the sentence"). This is not an example of using boilerplate language or checking boxes on a preprinted form.

We must balance the need for finality with the need to develop a record adequate for appellate review. This record was adequate to demonstrate Goodwin not only received the individualized sentencing hearing our precedent requires, but the district court also adequately articulated its findings on the record. We hold Goodwin's challenge to his sentence does not constitute a proper motion to correct an illegal sentence. Our determination is fatal to his claim he had a statutory right to counsel under *Jefferson,* 926 N.W.2d at 520. Our determination also means Goodwin's challenges to his sentence must be dismissed as untimely. Goodwin had to make these challenges in a direct appeal and failed to do so.

**IV. Disposition.**

For the foregoing reasons, we annul the writ and affirm the district court's ruling and sentence.

**WRIT ANNULLED; DISTRICT COURT RULING AND SENTENCE AFFIRMED.**

Mansfield, Christensen, and McDonald, JJ., join this opinion. McDonald, J., files a concurring opinion in which Christensen, J., joins. Appel, J., files a dissenting opinion in which Wiggins, C.J., joins.

#18–0737, *Goodwin v. Iowa Dist. Ct. for Davis Cty.*

**McDONALD, Justice (concurring specially).**

Goodwin's motion fails on its face to present a claim of an illegal sentence. There is nothing in the text of the Iowa Constitution, as originally understood, that prohibits the imposition of a minimum sentence on a juvenile offender. This is true whether or not the offender received an individualized sentencing hearing as now required by *State v. Lyle,* 854 N.W.2d 378 (Iowa 2014), and *State v. Roby*, 897 N.W.2d 127 (Iowa 2017). In my opinion, *Lyle* and *Roby* were wrongly decided and should be reconsidered.

Stare decisis does not compel continued adherence to *Lyle* and *Roby*. Stare decisis has limited application in constitutional matters. The Iowa Constitution provides, "This Constitution shall be the supreme law of the state, and any law inconsistent therewith, shall be void." Iowa Const. art. XII, § 1. Notably, the Iowa Constitution does not distinguish between legislative, executive, and judicial acts. Instead, the Iowa Constitution provides any law—without regard to its source—inconsistent therewith "shall be void." *Id.* Thus, "[w]hen faced with a demonstrably erroneous precedent, my rule is simple: We should not follow it. This view of *stare decisis* follows directly from the Constitution's supremacy over other sources of law—including our own precedents." *Gamble v. United States*, 587 U.S. ___, ___, 139 S. Ct. 1960, 1984 (2019) (Thomas, J., concurring).

> Put differently, because the Constitution is supreme over other sources of law, it requires us to privilege its text over our own precedents when the two are in conflict. I am aware of no legitimate reason why a court may privilege a demonstrably erroneous interpretation of the Constitution over the Constitution itself.

*Id.* at ___, 139 S. Ct. at 1985; *see State v. Brown*, 930 N.W.2d 840, 871 (Iowa 2019) (Appel, J., dissenting) (stating where constitutional precedent is supported by "unconvincing rationale" and weak authority, "the doctrine of stare decisis does not excuse us from" reconsidering the precedent).

*Lyle* and *Roby* are demonstrably erroneous interpretations of the Iowa Constitution. First, the rationale underlying the Supreme Court's juvenile sentencing decisions and this court's extension of the same in *Lyle* and *Roby* is wanting. The criticisms have been well stated in other opinions, and I need not repeat them in full herein. *See Miller v. Alabama*, 567 U.S. 460, 493–502, 132 S. Ct. 2455, 2477–82 (2012) (Roberts, C.J., dissenting); *id.* at 502–09, 132 S. Ct. at 2482–87 (Thomas, J., dissenting); *id.* at 509–15, 132 S. Ct. at 2487–90 (Alito, J., dissenting); *Graham v. Florida*, 560 U.S. 48, 97–124, 130 S. Ct. 2011, 2043–58 (2010) (Thomas, J., dissenting); *id.* at 124–25, 130 S. Ct. at 2058–59 (Alito, J., dissenting); *Roper v. Simmons*, 543 U.S. 551, 606–07, 125 S. Ct. 1183, 1216–17 (2005) (O'Connor, J., dissenting); *id.* at 607–30, 125 S. Ct. at 1217–30 (Scalia, J., dissenting); *Roby*, 897 N.W.2d at 150–61 (Zager, J., dissenting); *State v. Sweet*, 879 N.W.2d 811, 842–51 (Iowa 2016) (Mansfield, J., dissenting); *State v. Seats*, 865 N.W.2d 545, 574–84 (Iowa 2015) (Mansfield, J., dissenting); *Lyle*, 854 N.W.2d at 404–07 (Waterman, J., dissenting); *id.* at 407–20 (Zager, J., dissenting).

Second, a national consensus has emerged that *Lyle* was wrongly decided. To the best of my knowledge, only one other court has agreed with *Lyle*. *See State v. Houston-Sconiers*, 391 P.3d 409, 418 (Wash. 2017). The remainder of the other states that have expressly considered *Lyle* have expressly rejected *Lyle*. *See State v. Martinez*, No. 2 CA-CR 2017-0290-PR, 2017 WL 5153566, at *2 (Ariz. Ct. App. Nov. 2, 2017) (unpublished opinion) ("We do not read *Miller* to interpret the Eighth Amendment as

broadly as did the Iowa court."); *People v. Rigmaden*, No. C071533, 2015 WL 5122916, at *18 (Cal. Ct. App. Sept. 1, 2015) (unpublished opinion) (declining to follow *Lyle*); *Burrell v. State*, 207 A.3d 137, 144 (Del. 2019) (rejecting *Lyle* and discussing the "more persuasive authority from other states" that also reject *Lyle*); *Commonwealth v. Okoro*, 26 N.E.3d 1092, 1098–1101, 1101 n.17 (Mass. 2015) (rejecting *Lyle*); *State v. Anderson*, 87 N.E.3d 1203, 1212 (Ohio 2017) ("[A] mandatory minimum sentence of three years for first degree aggravated robbery and kidnapping convictions . . . does not violate the principle of proportionality at the heart of the Eighth Amendment . . . ."); *Brown v. State*, No. M2013-00825-CCA-R3-PC, 2014 WL 5780718, at *21 (Tenn. Crim. App. Nov. 6, 2014) (unpublished opinion) ("*Lyle* constitutes persuasive, non-binding authority, and panels of this court have refused to expand the holding in *Miller* to life sentences for juveniles, let alone sentences involving less than life."); *State v. Barbeau*, 883 N.W.2d 520, 531–33 (Wis. Ct. App. 2016) (declining to follow *Lyle*).

In addition to those states that have expressly declined to follow *Lyle*, a number of other states have also held there is no federal or state constitutional provision that prohibits the imposition of a minimum sentence on a juvenile offender. In *Commonwealth v. Lawrence*, the court reasoned,

> We do not read *Miller* to mean that the Eighth Amendment categorically prohibits a state from imposing a mandatory minimum imprisonment sentence upon a juvenile convicted of a crime as serious as first-degree murder. Appellant's argument against a mandatory minimum of 35 years presents the same concerns as would a mandatory minimum of 35 days' imprisonment. Stated another way, Appellant's position implicitly requires us to conclude that open-ended minimum sentencing is constitutionally **required** by the Cruel and Unusual Punishment Clause. We decline to announce such a rule.

99 A.3d 116, 121 (Pa. Super. Ct. 2014) (footnote omitted).

Similarly, in *James v. United States*, the court addressed the argument that a mandatory minimum "does not allow the sentencer to consider the 'mitigating qualities of youth,' as stressed in *Miller*." 59 A.3d 1233, 1238 (D.C. 2013) (quoting *Miller*, 567 U.S. at 476, 132 S. Ct. at 2467 (majority opinion)).

> [U]nder the D.C. Code, the D.C. Council and the Executive Branch have already considered youth and its attendant factors, by limiting the minimum sentence to thirty years for offenders under the age of eighteen at the time of their offense, as compared to life imprisonment without opportunity for release which is available against adults. *Miller* and *Graham* demand consideration of the mitigating qualities of youth when imposing sentences of life in prison without opportunity for parole. In this jurisdiction, sentencing is a joint exercise by the legislative, executive, and judicial branches. Because the sentencing statute already takes a juvenile offender's youth into account, the mandatory nature of appellant's sentence does not violate the Cruel and Unusual Punishment Clause of the Eighth Amendment.

*Id.* (citation omitted) (footnote omitted); *see also People v. Tate*, 352 P.3d 959, 970 (Colo. 2015) (holding *Miller* does not prohibit a mandatory minimum sentence of life with possibility of parole after forty years); *State v. Taylor G.*, 110 A.3d 338, 347 (Conn. 2015) ("The limitations that mandatory minimum sentences place on a trial court's discretion, however, do not automatically constitute an eighth amendment violation."); *State v. Michel*, 257 So. 3d 3, 4, 8 (Fla. 2018) (holding that a statute requiring a twenty-five-year mandatory minimum sentence for first-degree murder does not violate the Eighth Amendment); *State v. Brown*, 331 P.3d 781, 797 (Kan. 2014) (declining to extend *Miller*'s prohibition on mandatory life-without-parole sentences for juvenile offenders to also prohibit imposing a statutorily mandated twenty-year sentence on a juvenile because "[a] hard 20 life sentence does not

irrevocably adjudge a juvenile offender unfit for society"); *State v. Vang*, 847 N.W.2d 248, 262–63 (Minn. 2014) ("Because appellant is eligible for release after 30 years, his mandatory life sentence for first-degree murder does not constitute cruel and unusual punishment under the Eighth Amendment and the principles of *Miller*."); *State v. Link*, 441 P.3d 664, 676 (Or. Ct. App. 2019) (limiting "*Miller*'s applicability . . . [to] the most serious penalties"); *State v. Smith*, ___ S.E.2d ___, ___, 2019 WL 6166371, at *2 (S.C. Nov. 20, 2019) ("It is clear neither the Eighth Amendment nor *Miller* speaks directly to the issue of the constitutionality of mandatory minimum sentences. In so holding, we join the overwhelming majority of jurisdictions that has found mandatory minimum sentences constitutional under the Eighth Amendment and *Miller*." (Footnote omitted.)); *Lewis v. State*, 428 S.W.3d 860, 863 (Tex. Crim. App. 2014) ("*Miller* does not forbid mandatory sentencing schemes.").

Third, *Roby* created a largely unworkable standard. The unworkability of the standard was a feature and not a bug, at least as far as the *Roby* majority was concerned. The *Roby* standard was never intended to be workable; instead, it was intended to be a de facto ban on the imposition of minimum sentences on juvenile offenders. *See Roby*, 897 N.W.2d at 149 (Hecht, J., concurring specially) ("I write separately, however, to express my view that article I, section 17 of the Iowa Constitution prohibits a mandatory term of incarceration for any offense committed by a juvenile offender."); *id.* at 150 (Appel, J., concurring specially) ("The multifactored *Miller* test, as shaped by this court, powerfully drives the analysis toward a finding that children are constitutionally different and therefore, as a general proposition, juvenile offenders cannot be sentenced to mandatory adult minimums."); *id.* at 150–51 (Zager, J., dissenting) (explaining the "court restates the relevant

factors in a way that will make it difficult, if not practically impossible, for a sentencing judge to ever impose any minimum term of incarceration"). The dissenting opinion in this case evidences *Roby* was intended to be a de facto ban on minimum sentences for juvenile offenders. Here, the parties jointly recommended a minimum sentence, the jointly recommended minimum sentence was far below what the district court could have imposed, the defendant's expert testimony supported the sentence, and the district court made an excellent record in support of the sentencing decision. If this record is insufficient to meet the *Roby* standard, as expressed in the dissenting opinion in this case, few, if any, could.

Fourth, the neuroscience on which *Lyle* and *Roby* relied does not support the ultimate constitutional claims asserted in those cases. *Lyle* interpreted relatively new neuroscience research to support the claim that juvenile offenders are less culpable than adult offenders. *See Lyle*, 854 N.W.2d at 398 (majority opinion) (stating "scientific data and the opinions of medical experts provide a compelling and increasingly ineluctable case that from a neurodevelopment standpoint, juvenile culpability does not rise to the adult-like standard"). But the neuroscience does not support this claim. "The neuroscience evidence in no way independently confirms that adolescents are less responsible" or less culpable than adult offenders. Stephen J. Morse, *Criminal Law and Common Sense: An Essay on the Perils and Promise of Neuroscience*, 99 Marq. L. Rev. 39, 66–67 (2015). Nor could it. Culpability is a legal question not a neurobiological question. *See, e.g.*, *State v. McVey*, 376 N.W.2d 585, 587 (Iowa 1985) ("The extent to which evidence of mental impairment will be permitted to affect criminal responsibility is therefore a legal question."). Indeed, the American Medical Association and the American Academy of Child and

Adolescent Psychiatry specifically acknowledged this in their amicus brief submitted in *Miller*. *See* Brief for Am. Med. Ass'n & Am. Acad. of Child & Adolescent Psychiatry as Amici Curiae in Support of Neither Party at 3, *Miller*, 567 U.S. 460, 132 S. Ct. 2455 (Nos. 10-9646, 10-9647) (recognizing that "science cannot gauge moral culpability").

Fifth, while the neuroscience evidence is new, it does not tell us something new for which the law did not already account. We have long known juveniles are different from adults. Almost twenty-nine centuries ago, Homer said, "Well you know how the whims of youth break all the rules. Our wits quicker than wind, our judgment just as flighty." Homer, *The Iliad* 577 (Robert Fagles trans., Penguin Books 1998) (c. 800 B.C.E.). In another translation it is said, "You know young people can go to extremes—they have quick tempers, a dash of rashness[.]" Homer, *The Iliad* 423 (Michael Reck trans., HarperCollins 1st ed. 1994) (c. 800 B.C.E.). In *Juvenile Offenders for a Thousand Years*, Wiley B. Sanders collected numerous historical writings documenting the different treatment of juvenile and adult offenders. *Juvenile Offenders for a Thousand Years: Selected Readings from Anglo-Saxon Times to 1900* (Wiley B. Sanders ed., Univ. N.C. Press 1970). He writes,

> In the minds of many intelligent and educated people juvenile delinquency is a twentieth century problem, receiving its first public recognition from the passage of the first juvenile court act in Illinois in 1899. Such people assume that before the beginning of this century child lawbreakers were tried and punished in exactly the same way, and with the same severity, as adult offenders. . . . These selections . . . make it abundantly clear that as far back as written records go children who have broken the law have been treated on the whole more leniently than have adult offenders.

*Id.* at xviii. *Lyle* conceded the new research on which it relied merely provided a potential explanation of "our commonsense understanding of

youth." *Lyle*, 854 N.W.2d at 393.[5] *Lyle* also conceded the law already accounted for the differences between juveniles and adults in a variety of contexts. *See id.* at 388–89 (discussing chapter 232, work permits, the legal age for purchasing alcohol, the legal age for obtaining driving privileges, the legal age for obtaining tattoos, and the legal age to purchase tobacco). What *Lyle* failed to concede or even recognize was that the law already accounted for the differences between juveniles and adults with respect to criminal conduct. The legislature already accounted for this by creating a separate juvenile justice system to address the different and particular needs of juvenile offenders. *See* Iowa Code ch. 232 (2019). The legislature also made a policy decision that, notwithstanding the known differences between juveniles and adults, there are circumstances under which a juvenile offender should nonetheless be prosecuted and punished

---

[5]It should be noted that the findings drawn from the research are not settled. More recent studies suggest that the conclusions drawn from the research may be more nuanced than *Lyle* acknowledges. For example, Dan Romer, Research Director at the Annenberg Public Policy Center at the University of Pennsylvania recently wrote,

> We often characterize adolescents as impulsive, reckless and emotionally unstable. We used to attribute this behavior to "raging hormones." More recently, it's been popular in some scientific circles to explain adolescent behavior as the result of an imbalance in the development of the brain.
>
> According to this theory, the prefrontal cortex, the center of the brain's cognitive-control system, matures more slowly than the limbic system, which governs desires and appetites including drives for food and sex. This creates an imbalance in the adolescent brain that leads to even more impulsive and risky behavior than seen in children – or so the theory goes.
>
> This idea has gained currency to the point where it's become common to refer to the "teenage brain" as the source of the injuries and other maladies that arise during adolescence.
>
> In my view, the most striking failure of the teen brain hypothesis is its conflating of important differences between different kinds of risky behavior, only a fraction of which support the notion of the impulsive, unbridled adolescent.

Dan Romer, *Why It's Time to Lay the Stereotype of the 'Teen Brain' to Rest*, The Conversation (Oct. 29, 2017, 9:50 PM), https://theconversation.com/why-its-time-to-lay-the-stereotype-of-the-teen-brain-to-rest-85888 [https://perma.cc/2EUM-ZQ9Z].

as an adult offender. *See id.* §§ 232.8, .45. *Lyle* and *Roby* thus confused neuroscience research as evidence of a new constitutional fact mandating different treatment for juvenile offenders rather than treating the neuroscience research for what it was—additional evidence supporting the legislature's decision to create a separate juvenile justice system.

Sixth, and related, *Lyle* infringes the legislature's prerogative. *Lyle* stated that "[l]ines are drawn in our law by necessity and are incorporated into the jurisprudence we have developed to usher the Iowa Constitution through time." *Lyle*, 854 N.W.2d at 403. *Lyle*'s passive construction that "lines are drawn in our law" masks the relevant question. The relevant question is not whether lines have to be drawn. The relevant question is who draws the lines. *Lyle* does not adequately explain why this court has the authority to disregard the lines the legislature drew in creating a separate juvenile justice system. In my view, there is not an adequate explanation. "The legislature possesses the inherent power to prescribe punishment for crime, and the sentencing authority of the courts is subject to that power." *State v. Iowa Dist. Ct.*, 308 N.W.2d 27, 30 (Iowa 1981). It is solely the legislature's prerogative to set punishments that balance the state's interest in achieving certain penological goals with the state's other interests in the administration of criminal justice. While there are constitutional bounds the legislature may not transgress in crafting punishments, requiring an offender to serve a minimum term of incarceration for what is an otherwise valid sentence is not one. *See State v. Cronkhite*, 613 N.W.2d 664, 669 (Iowa 2000) ("There can be no serious contention . . . a sentence which is not otherwise cruel and unusual becomes so simply because it is 'mandatory.' " (quoting *State v. Lara*, 580 N.W.2d 783, 785 (Iowa 1998))).

Finally, while purporting to better serve the liberty of Iowans, *see Lyle*, 854 N.W.2d at 384 n.2 (noting this court can interpret the constitution to better serve the liberty of Iowans), *Lyle* and *Roby* actually restrict the liberty of Iowans. The most fundamental liberty in a constitutional republic is the liberty of the citizenry to govern itself. *See* Iowa Const. art. I, § 2 ("All political power is inherent in the people."); *see also Honomichl v. Valley View Swine, LLC*, 914 N.W.2d 223, 240 (Iowa 2018) (Waterman, J., concurring) ("We need to be cognizant of the right of Iowans to govern themselves through laws passed by their chosen representatives, a right recognized explicitly in article I, section 2 [of the Iowa Constitution]."). To protect the right of all Iowans to participate in the project of self-government, this court long ago concluded the judicial power was limited to the enforcement of the text of the constitution the citizens of this state adopted. *See Stewart v. Bd. of Supervisors*, 30 Iowa 9, 17 (1870).

As *Stewart* makes clear, in the absence of a direct constitutional command, it is the right *and duty* of the people to resolve questions of public policy through public discourse in the legislative chamber rather than through legal discourse in the judicial chamber:

> We cannot declare a legislative act void because it conflicts with our opinions of policy, expediency or justice. We are not the guardians of the rights of the people of the State unless they are secured by some constitutional provision which comes within our judicial cognizance. The remedy for unwise or oppressive legislation, within constitutional bounds, is by appeal to the justice and patriotism of the representatives of the people. If this fail[s], the people, in their sovereign capacity, can correct the evil; but the courts cannot assume their rights. There is no *paramount* and *supreme* law which defines the law of nature, or settles those great principles of legislation which are said to control State legislatures in the exercise of the powers conferred on them by the people in the constitution.

*Id.* (quoting *Bennett v. Boggs*, 3 F. Cas. 221, 227–28 (C.C.D.N.J. 1830)).

As Justice Hugo Black explained, the creation of rights through atextual constitutionalism actually infringes the fundamental liberty of all people to participate in the project of self-government:

> It can be, and has been, argued that when this Court strikes down a legislative act because it offends the idea of "fundamental fairness" it furthers the basic thrust of our Bill of Rights by protecting individual freedom. But that argument ignores the effect of such decisions on perhaps the most fundamental individual liberty of our people—the right of each man to participate in the self-government of his society. . . . Any legislature presumably passes a law because it thinks the end result will help more than hinder and will thus further the liberty of the society as a whole. The people, through their elected representatives, may of course be wrong in making those determinations, but the right of self-government that our Constitution preserves is just as important as any of the specific individual freedoms preserved in the Bill of Rights. The liberty of government by the people in my opinion, should never be denied by this Court except when the decision of the people as stated in laws passed by their chosen representatives, conflicts with the express or necessarily implied commands of our Constitution.

*In re Winship*, 397 U.S. 358, 384–85, 90 S. Ct. 1068, 1083–84 (1970) (Black, J., dissenting).

This, in my view, is the fundamental defect in *Lyle* and *Roby*. *See generally Miller*, 567 U.S. at 493, 132 S. Ct. at 2477 (Roberts, C.J., dissenting) ("Determining the appropriate sentence for a teenager convicted of murder presents grave and challenging questions of morality and social policy. Our role, however, is to apply the law, not to answer such questions."); *id.* at 502, 132 S. Ct. at 2482 (Thomas, J., dissenting) ("Because the Court upsets the legislatively enacted sentencing regimes of 29 jurisdictions without constitutional warrant, I respectfully dissent."); *id.* at 510, 132 S. Ct. at 2487 (Alito, J., dissenting) ("Nothing in the Constitution supports this arrogation of legislative authority."); *Graham*, 560 U.S. at 97, 130 S. Ct. 2043 (Thomas, J., dissenting) ("I am unwilling

to assume that we, as Members of this Court, are any more capable of making such moral judgments than our fellow citizens. Nothing in our training as judges qualifies us for that task, and nothing in Article III gives us that authority."); *Roper*, 543 U.S. at 607, 125 S. Ct. at 1217 (O'Connor, J., dissenting) ("[T]his Court should not substitute its own 'inevitably subjective judgment' on how best to resolve this difficult moral question for the judgments of the Nation's democratically elected legislatures." (quoting *Thompson v. Oklahoma*, 487 U.S. 815, 854, 108 S. Ct. 2687, 2709 (1988) (O'Connor, J., concurring))); *id.* at 608, 125 S. Ct. at 1217 (Scalia, J., dissenting) (decrying the Court's decision to "proclaim[] itself sole arbiter of our Nation's moral standards"); *Yick Wo v. Hopkins*, 118 U.S. 356, 370, 6 S. Ct. 1064 1071 (1886) (stating political rights are "fundamental" because they are "preservative of all rights").

For these reasons, I conclude *Lyle* and *Roby* were wrongly decided. In my view, the defendant in this case did not present a facially viable claim of an unconstitutional or otherwise illegal sentence. With all that being said, I concur in the majority opinion and the judgment of the court.

Christensen, J., joins this concurrence.

**APPEL, Justice (dissenting).**

I dissent as the majority prematurely terminates this litigation, misstates the law in places, and does not recognize the unusual procedural posture of this case.

## I. Cruel and Unusual Punishment for Juveniles.

**A. Introduction.** A claim that a sentence violates the cruel and unusual punishment clause of article I, section 17 of the Iowa Constitution may be brought categorically or as applied. *State v. Oliver*, 812 N.W.2d 636, 639–41 (Iowa 2012). In order to prevail on a categorical claim, a defendant must show that the punishment cannot be applied based on the characteristics of the crime or the criminal. *Id.* at 641. An as-applied challenge can be brought when the defendant claims that a sentence as applied to the peculiar circumstances of the case amounts to cruel and unusual punishment even though the sentence has been authorized by the legislature. *State v. Bruegger*, 773 N.W.2d 862, 879 (Iowa 2009).

**B. Cruel and Unusual Punishment for Juvenile Offenders Under *Roby*.**

1. *Overview of juvenile sentencing caselaw.* In order to implement the constitutional requirements of article I, section 17 of the Iowa Constitution, we have developed a special area of jurisprudence as it relates to juveniles. With respect to juveniles facing mandatory minimum sentences, in *State v. Roby*, 897 N.W.2d 127 (Iowa 2017), we developed a framework of analysis for as-applied, *Bruegger*-type, cruel and unusual punishment claims. A brief review of our recent caselaw in juvenile sentencing provides context for a cruel and unusual punishment claim under *Roby*.

In *State v. Lyle*, 854 N.W.2d 378. 381–82 (Iowa 2014), we considered the constitutional validity of statutorily established mandatory minimum sentences for youthful offenders. In *Lyle*, we held that legislative mandatory minimum sentences for juvenile offenders violated article I, section 17 of the Iowa Constitution. *Id.* at 400. However, we stated that our holding did not prohibit judges from sentencing juveniles to prison for the length of time identified by the legislature for the crime committed. *Id.* at 403. Further, we held that the Iowa Constitution forbids a mandatory sentencing scheme that "deprives the district court of discretion to consider youth and its attendant circumstances as a mitigating factor and to impose a lighter punishment by eliminating the minimum period of incarceration without parole." *Id.* at 404. We did not have occasion in *Lyle*, however, to develop the outline of a sentencing hearing of a juvenile.

In *State v. Seats*, 865 N.W.2d 545 (Iowa 2015), however, we provided more guidance regarding the nature of a sentencing hearing for juveniles. In *Seats*, we declared that a district court sentencing a juvenile in a murder case must consider several factors. The factors articulate namely that life in prison without the possibility of parole should be "rare and uncommon"; that "children are constitutionally different from adults" and that the court should consider "family and home environment vulnerabilities together with the juvenile's lack of maturity, underdeveloped sense of responsibility, and vulnerability to peer pressure as mitigating, and not aggravating, factors." *Id.* at 555–56 (quoting *Miller v. Alabama*, 567 U.S. 460, 470, 132 S. Ct. 2455, 2664 (2012)). The court must also consider the circumstances of the offense, including the juvenile's participation in the conduct and the way familial pressure and peer pressure may have played a role and that "[j]uveniles are more capable of change than adults" and "their actions are less likely to be the result of 'irretrievably depraved

character.' " *Id.* at 556 (quoting *Graham v. Florida*, 560 U.S. 48, 68, 130 S. Ct. 2011, 2016 (2010)). In sum, the court must take into account information regarding the family and home environment. *Id.* In *Seats*, we noted "the district court appeared to use Seats's family and home environment vulnerabilities[,] together with his lack of maturity, underdeveloped sense of responsibility, and vulnerability to peer pressure[,] as aggravating, not mitigating factors." *Id.* at 557. Based on these constitutional deficiencies, we vacated the sentence and remanded the case to the district court. *Id.* at 558; *see also Lyle*, 854 N.W.2d at 404 n.10 (outlining the parameters of resentencing to be consistent with youth-related factors).

In *Roby*, we considered a case where the district court sentenced a juvenile defendant to twenty-five years in prison with a mandatory minimum of seventeen-and-one-half years for sexual abuse in the second degree. *Roby*, 897 N.W.2d at 132. The *Roby* majority declined "at this time" to hold that mandatory minimum sentences on juvenile offenders were categorically infirm. *Id.* at 148. The *Roby* court did, however, turn to analyze the nature of the individualized hearing required by our precedent for juvenile offenders. *Id.* at 145–48.

The *Roby* court examined in detail the factors of age and the features of youthful behavior, family and home environment, the circumstances of the crime, legal incompetency, and rehabilitation. We generally emphasized the role of expert testimony in developing each of these mitigating factors. *Id.* at 145–46. We stated the factors should not normally be used to impose a mandatory minimum sentence without expert testimony. *Id.* at 147.

Based on the record developed in *Roby*, we concluded, as a matter of law, a mandatory minimum sentence could not be imposed on the

defendant. We noted how the district court has misapplied the various factors, either finding them aggravating factors or underestimating their mitigating impact. *Id.* at 148. Although *Roby* received an individualized hearing, we upheld Roby's illegal sentence claim, noting that "the district court applied the [*Miller/Lyle/Seats*] factors, but not in the manner required to protect the juvenile offender from cruel and unusual punishment." *Id.*

Following *Roby*, a statutorily authorized mandatory minimum sentence imposed on a juvenile after a hearing where the district court refused to consider or give proper weight to the *Roby* factors, or wrongly applied them as aggravating factors, would be constitutionally infirm under article I, section 17 of the Iowa Constitution. *See, e.g., State v. White*, 903 N.W.2d 331, 334 (Iowa 2017) (finding resentencing with *Roby* factors necessary for a juvenile offender in a mandatory minimum situation). The mere fact that a sentence is authorized by statute is not the end of the matter, as incorrectly suggested by the majority. We have said that a restriction on parole under *Roby* should be an "uncommon result," even where the legislature has established a mandatory statutory minimum. *Roby*, 897 N.W.2d at 147.

The majority opinion contains passages that seem to mistakenly suggest that if there is an individualized hearing—any individualized hearing—there is no claim under *Roby*. That is plainly wrong. It would be absurd to suggest that *Roby* establishes merely a procedural right regardless of the propriety or constitutionality of the substance. The mere fact that the district court holds a hearing does not necessarily mean the district court is authorized to impose a mandatory minimum sentence on any juvenile regardless of the record established as a result of the proceeding. In order to be constitutionally sound, the *Roby*-type hearing

must proceed under the constitutional framework established by our juvenile cruel and unusual punishment cases. That means that mandatory minimum sentences are "uncommon," that there is a presumption against mandatory minimum sentences, and that the features of youth identified in *Seats* are actually considered as mitigating, and not aggravating, factors. In other words, the exercise of the court's discretion must be consistent with our established juvenile framework. As noted in *Roby*, "while the review is for abuse of discretion, it is not forgiving of a deficiency in the constitutional right to a reasoned sentencing decision based on a proper hearing." *Id.* at 138.

2. *Summary.* A claim that a sentence is illegal may be brought by a juvenile defendant even though there has been an individualized hearing. Furthermore, the mere fact that a sentence is within the range of punishment established by the legislature is not, as a matter of law, determinative of a claim of cruel and unusual punishment under article I, section 17 of the Iowa Constitution.

**II. Application of Principles to This Case.**

**A. Self-Representation in District Court.** Goodwin engaged in self-representation in the district court when he sought to attack his sentence. He filed what he labeled "A Motion to Correct an Illegal Sentence For Appointment of Counsel and An Evidentiary Hearing." It states that the district court

> failed to properly weigh the factors cited in State v. Roby . . . and failed to consider any expert testimony determining those factors, as well as other evidence and testimony that defendant cannot be sentenced to any mandatory-minimum sentence without violating both the Iowa and U.S. Constitutions.

Goodwin also stated he was indigent and sought the appointment of counsel to assist in his representation. The State did not resist the motion

to correct an illegal sentence or for appointment of counsel before the district court dismissed the matter.

We have repeatedly stated that with respect to self-represented criminal litigants, applications for appointment of counsel should be considered in the light most favorable to the applicant. *Furgison v. State*, 217 N.W.2d 613, 615 (Iowa 1974) ("[I]n determining whether counsel should be appointed, trial judges should inceptionally read the often inartfully drawn application in a light most favorable to the applicant."). We have cited with approval the notion that state court judges must learn to read inartfully drawn petitions liberally in favor of the petition. *See Knight v. Knight*, 525 N.W.2d 841, 843 (Iowa 1994) (noting that in evaluating pro se filings, "some leeway must be accorded from precision in draftsmanship"); *Smith v. Smith*, 513 N.W.2d 728, 731–32 (Iowa 1994) (noting that "[a]n inartfully drawn [pro se] petition hastily dismissed—as this one was—could leave the petitioner without any [means of recourse from the court]"); *State v. Mulqueen*, 188 N.W.2d 364, 365 (Iowa 1971) ("An applicant for such relief ought not to be held to the niceties of lawyers' pleadings or be cursorily dismissed because his claim seems unlikely to prove meritorious." (quoting *Sanders v. United States*, 373 U.S. 1, 22, 88 S. Ct. 1068, 1080 (1963)); *Munz v. State*, 382 N.W.2d 693, 697 (Iowa Ct. App. 1985) (noting that an "applicant proceeding pro se is entitled to a liberal construction of his pleadings").

Like Iowa, many other states have found similarly. *See, e.g., Tobar v. Remington Holdings LP*, 447 P.3d 747, 753 (Alaska 2019) ("We have also concluded that pleadings of self-represented litigants should be held to a less stringent standard and that their briefs are to be read generously."); *Jones v. Williams*, 443 P.3d 56, 58 (Colo. 2019) ("Pleadings by pro se litigants must be broadly construed to ensure that they are not denied

review of important issues because of their inability to articulate their argument like a lawyer."); *Henderson v. Comm'r of Corr.*, 189 A.3d 135, 145 (Conn. 2018) ("The modern trend . . . is to construe pleadings broadly and realistically, rather than narrowly and technically. . . . The courts adhere to this rule to ensure that pro se litigants receive a full and fair opportunity to be heard, regardless of their lack of legal education and experience . . . ." (alterations in original) (quoting *Oliphant v. Comm'r of Corr.*, 877 A.2d 761, 766 (Conn. 2005))); *Zephaniah v. Ga. Clinic, P.C.*, 829 S.E.2d 448, 451 (Ga. Ct. App. 2019) (noting in interpreting Georgia law, "we are required to (1) construe a complaint in the light most favorable to the plaintiff with any doubts resolved in her favor and (2) hold *pro se* pleadings to less stringent standards than formal pleadings drafted by attorneys"); *Villaver v. Sylva*, 445 P.3d 701, 708 (Haw. 2019) ("In the context of pro se pleadings, we have explained that '[a] fundamental tenet of Hawai'i law is that "[p]leadings prepared by pro se litigants should be interpreted liberally[,]" ' and that '[t]he underpinnings of this tenet rest on the promotion of equal access to justice[.]' " (alterations in original) (quoting *Waltrip v. TS Enters., Inc.*, 398 P.3d 815, 828 (Haw. 2016))); *State v. Redding*, 444 P.3d 989, 993 (Kan. 2019) ("Courts are to interpret pro se pleadings based upon their contents and not solely on their title or labels. In construing pro se postconviction motions a court should consider the relief requested, rather than a formulaic adherence to pleading requirements." (Citation omitted.)); *Adkins v. Wrightway Readymix, LLC*, 499 S.W.3d 286, 289 (Ky. Ct. App. 2016) ("[W]e would repeat the notion of a duty incumbent on trial courts to 'liberally construe *pro se* pleadings to extract the [*pro se* litigant]'s intent and bring about a full adjudication of the relevant issues.' " (alterations in original) (quoting *Taylor v. Commonwealth*, 354 S.W.3d 592, 594 (Ky. Ct. App. 2011))); *State v. Vasko*,

889 N.W.2d 551, 556 (Minn. 2017) ("Further, courts are encouraged to read the pleadings of pro se appellants 'with an understanding eye.'" (quoting *Leake v. State*, 737 N.W.2d 531, 540 n.3 (Minn. 2007))); *Whitlock v. Necaise*, 200 So. 3d 1096, 1099 (Miss. Ct. App. 2016) ("Where, as here, a prisoner is proceeding pro se, we take that fact into account and, in our discretion, credit not so well pleaded allegations . . . to the end that a prisoner's meritorious complaint may not be lost because inartfully drafted." (alteration in original (quoting *Singleton v. Stegall*, 580 So. 2d 1242, 1245 (Miss. 1991)))); *Ward v. N.Y.C. Transit Auth. Transit Adjudication Bureau*, 95 N.Y.S.3d 779, 780 (Sup. Ct. 2019) ("[A]s a general rule, *pro se* parties' pleadings are to be 'liberally construed, and, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" (quoting *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 2200 (2007) (per curiam))); *Baker v. Lifeline Field Mktg., LLC*, 93 N.E.3d 1231, 1235 n.2 (Ohio Ct. App. 2017) ("As this court has recognized, 'a court may afford a pro se litigant reasonable leeway in the construction of pleadings in order to reach the merits of the action.'" (quoting *State v. Rickard*, No. L-16-1043, 2016 WL 3578984, at *1 (Ohio Ct. App. June 30, 2016)))); *Peck v. S.D. Penitentiary Emps.*, 332 N.W.2d 714, 716 (S.D. 1983) ("Generally, a pro se complaint, such as the one filed in this case, is held to less stringent standards than formal pleadings drafted by a lawyer . . . ."); *State v. Willis*, 496 S.W.3d 653, 720 (Tenn. 2016) ("Pleadings prepared by self-represented litigants untrained in the law should be measured by less stringent standards than those applied to pleadings prepared by lawyers."); *Byrnes v. Harper*, 435 P.3d 364, 366 (Wyo. 2019) ("A pro se litigant is entitled to some leniency from the stringent standards applied to formal pleadings drafted by attorneys." (quoting *Young v. State*, 46 P.3d 295, 297 (Wyo. 2002))).

As noted by the United States Supreme Court, "it is settled law that the allegations of [a pro se] complaint . . . are held to 'less stringent standards'" and "should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Hughes v. Rowe*, 449 U.S. 5, 9–10, 101 S. Ct. 173, 176 (1980) (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S. Ct. 594, 596 (1972) (per curiam)). These principles should apply here.

The majority knows these principles exist, but attempt to evade them by citing *State v. Piper*, 663 N.W.2d 894, 913–14 (Iowa 2003), *overruled by State v. Hanes*, 790 N.W.2d 545, 551 (Iowa 2010), and *Conkey v. Hoak Motors, Inc.*, 637 N.W.2d 170, 173 (Iowa 2001). Neither of these cases involve the proper approach to a pro se pleading in a motion to correct an illegal sentence. *Piper* involved a criminal case where the defendant was represented by counsel. *See Piper*, 663 N.W.2d at 913. *Conkey* does not involve a pro se pleading in a motion to correct an illegal sentence but considered a question related to the inadequacies of proof offered at trial by a pro se party. *See Conkey*, 637 N.W.2d at 173. These cases have nothing at all to do with the question of proper approach to pro se pleadings in this motion to correct an illegal sentence matter.

The district court dismissed the claim without a hearing in a terse order two weeks after it was filed. The district court's reasoning stated in total that "[a]fter review of the Motion and applicable law, the Court finds no merit in said Motion." The district court did not appoint counsel and apparently did not review the record, but simply dismissed the motion on the pleading.

Goodwin's pleading plainly states that he claims entitlement to relief under *Roby*. He also alleges that his sentence is unconstitutional under

both the Iowa and United States Constitutions. Combined with the citation to *Roby*, his general reference to the Iowa and United States Constitutions clearly implicate the cruel and unusual punishment clauses of both.

Citing *Bruegger*, the State in its appeal brief concedes, as it must, that Goodwin may raise "a substantive illegality and request counsel if he raises a gross-disproportionality claim." But Goodwin has specifically raised a claim under *Roby* and generally claims that his sentence is unconstitutional. The method of implementing a gross disproportionality analysis in the context of mandatory minimum claims was outlined in *Roby*. The State's slicing and dicing of cruel and unusual punishment claims is not the way we ordinarily treat a pro se filing.

**B. Sua Sponte Dismissal of Pro Se Request for Appointment of Counsel.** A litigant who raises a question of an illegal sentence has a statutory right to appointment of counsel. *See generally Jefferson v. Iowa Dist. Ct.*, 926 N.W.2d 519, 520 (Iowa 2019). This statutory right broadly recognizes the need for the guiding hand of counsel in making illegal sentence claims.

In addition, a motion to correct an illegal sentence is a critical stage of the criminal trial process. *See Tully v. Scheu*, 607 F.2d 31, 35–36 (3d Cir. 1979); *Williams v. State*, 10 So. 3d 660, 661 (Fla. Dist. Ct. App. 2009). Both the Sixth Amendment and article I, section 10 of the Iowa Constitution provide for representation of counsel in "all criminal proceedings." Iowa Const. art. I, § 10. A motion to correct an illegal sentence is part and parcel of the criminal proceeding. *See State v. Casiano*, 922 A.2d 1065, 1069–70 (Conn. 2007) (finding right to counsel attaches to all criminal actions, including all appeals); *State v. Rudolf*, 821 So. 2d 385, 386 (Fla. Dist. Ct. App. 2002); *State v. Clements*, 192 A.3d 686,

693–94 (Md. 2018). And, article I, section 10 of the Iowa Constitution extends the right to counsel to all other cases involving the life or liberty of the accused. Iowa Const. art. I, § 10. There is thus a constitutional footing under both the United States and Iowa Constitutions for the representation of parties challenging their sentences as illegal.

Here, counsel would review the circumstances of the murder, consider the relevance of the plea bargain itself and the plea bargain hearing, and shape whatever potential claim Goodwin might have. It is premature, based on the mere filing of the petition, to dismiss the claim out-of-hand because it somehow fails to use language specific enough, according to the State, to give rise to a gross disproportionality claim. Counsel was appointed for Goodwin, the parties briefed the matter, and this court heard oral argument.

But at the district court, Goodwin was denied appointment of counsel in a sua sponte order by the court. The case was not developed at all in the district court. The approach of the district court was not followed by this court on appeal. We opened the courthouse gate by granting certiorari, and we then appointed counsel. This is precisely the path that should have been followed at the district court. Indeed, if it is true that the certiorari petition was correctly granted and counsel on appeal properly granted, it is almost certain that the district court erred when faced with essentially the same issues after Goodwin filed his motion.

**C. Arguments and Concessions on Appeal.** On appeal, Goodwin concentrates his fire on the question of whether the district court should have appointed counsel and not dismissed the claim. Goodwin notes, among other things, that counsel could have provided assistance in presenting arguments to demonstrate why the district court failed to

provide Goodwin with the constitutionally required individualized sentencing process he was entitled to receive. *See State v. Zarate*, 908 N.W.2d 831, 855–56 (Iowa 2018). Further, Goodwin claims that counsel "could develop the factual evidence and argument to prove it is time for categorical rejection of mandatory minimums for juveniles." In support of this suggestion, Goodwin cites *Roby*, where we stated that "in our independent judgment article I, section 17 *does not yet* require abolition of the practice." 897 N.W.2d at 143 (emphasis added).

The State narrowly reads Goodwin's appellate brief as stating only that the district court "abused its discretion" and that such a claim does not arise to a violation of article I, section 17 of the Iowa Constitution. If the district court acted within the legal bounds of its discretion, that would be an unremarkable claim. But in context, Goodwin is claiming the district court exercised its discretion in a way that violated article I, section 17. As noted in *Roby*, though the weighing of sentencing factors is generally for abuse of discretion, "it is not forgiving of a deficiency in the constitutional right to a reasoned sentencing decision based on a proper hearing." *Id.* at 138. The mere fact that a district court sentence is attacked as an abuse of discretion *does not mean it might not also be unconstitutional.*

Further, the State concedes, as already indicated, that Goodwin has a potential *Bruegger*-type claim. The State, however, argues that Goodwin did not raise this claim, instead asking only that the court examine the adequacies of procedures and findings at his sentencing hearing, which did not implicate the legality of the sentence itself.

But this is exactly why counsel should have been appointed at the district court proceedings in the first place. Counsel could have filed an

amended pleading, to the extent one was necessary, and developed the factual and legal basis for any cruel and unusual punishment claim.

The majority strictly construes Goodwin's pro se pleading, claiming in a footnote that Goodwin did not claim that his sentence is grossly disproportionate to the crime he committed. This approach, of course, is flatly contrary to our ordinary approach to pro se pleadings. Apparently the majority believes that a self-represented litigant must cite *Bruegger* or must use the magic words "gross disproportionality." But doesn't the allegation that a sentence is cruel and unusual at least imply that the sentence is grossly disproportionate? *See* Julie M. Bradlow, *Procedural Due Process Rights of Pro Se Civil Litigants*, 55 U. Chi. L. Rev. 659, 678 (1988) (noting that liberal construction of pro se pleadings is designed to avoid narrow dismissals where a cause of action exists but where the complaint fails to say the "magic words").

But even more importantly, what the footnote fails to recognize is that the State concedes that Goodwin is entitled to bring a *Bruegger*-type grossly disproportionate claim. While the State, like the majority, adopts a restrictive and narrow interpretation of Goodwin's pleading, the State would allow Goodwin to bring another claim in district court. The majority opinion notes the preservation issue but not the substantive part of the State's concession. Indeed, language in the majority opinion indicating that Goodwin is only entitled to an individualized hearing, regardless of the nature of that hearing, and that Goodwin is not entitled to bring a claim against a statutorily authorized sentence, is not only far beyond the State's position, but directly contrary to it.

**D. Limited Nature of Plea Hearing: No Contest of Mandatory Minimum.** The majority does not really consider whether Goodwin's pleading should have been dismissed, without the appointment of counsel,

but rather essentially proceeds to try the case on the merits. That is the point of the ten-page discussion in the majority opinion of what it sees as the facts, going far beyond the pleading in this case. What is really going on here is this court, on appeal, is granting summary judgment based on its review of matters outside the pleadings, without allowing Goodwin to be represented by counsel.

In its cursory summary judgment-type analysis, it relies on the hearing at the plea bargain stage where no one challenged the application of a mandatory minimum sentence for Goodwin. The record was developed not for the purpose of challenging an application of a mandatory minimum under *Roby* but to defend the application of a twenty-year minimum sentence in lieu of a potentially longer thirty-five year mandatory minimum sentence.

I do not think it appropriate at this stage of the proceeding to rely on that kind of record in resolving Goodwin's claim that the facts are against him as a matter of law. We simply do not have a complete record in this case. Instead of an adversarial hearing where the case is made that a mandatory minimum should not be imposed, we have instead a hearing on a plea bargain in which Goodwin's counsel did essentially the opposite. At the hearing, not only did counsel not contest a mandatory minimum, but counsel also urged the court to accept one that was lower than what he might have otherwise received. In short, Goodwin essentially conceded that his case was one of those "uncommon matters" for which a mandatory minimum sentence under *Roby* was appropriate.

In fact, no one at the plea hearing contested the application of a mandatory minimum, and no attempt was made by anybody to show that a mandatory minimum should not be imposed. As a result, the record that was developed was for the sharply limited purpose of defending the

imposition of a statutory minimum of twenty years rather than a larger mandatory minimum potential of thirty-five years. No one attempted to show at the plea hearing that a twenty-year minimum could not be imposed in light of the *Roby* factors.

Because of its limited focus, the plea hearing cannot be regarded as a full trial record at this stage of the proceeding to attempt to determine the merits of Goodwin's claim. The majority treats the very limited record developed in support of the plea as if it were a full-blown *Roby* hearing, but that is plainly not the case.

What the majority has done here is not affirm a dismissal on the pleadings, but instead fast forward the case and try it on appeal on the merits of the very limited record developed in the context of plea bargaining proceedings. I think that is an incorrect and unjust result. Instead, the case should be remanded to the district court for appointment of counsel. It may well be, of course, that the State will be entitled to summary judgment in this case. But we are not a court of first resort, nor can we short circuit the process. By trying the case on appeal, the majority cuts off the ability of Goodwin, assisted by counsel, to offer evidence and develop legal theories in the district court.

If we are to try the case on appeal on the merits, I am not at all sure that the State will prevail. "A sentence of incarceration without parole eligibility will be an uncommon result." *Roby*, 897 N.W.2d at 147. The majority edits this sentence out of *Roby*. Indeed, although the record in *Roby* contained unattractive features, the *Roby* court held, as a matter of law, that the mandatory minimum involved in the case could not be constitutionally applied.

Some of the *Miller/Lyle/Seats/Roby* factors, such as immaturity, risk taking, and impetuousness, obviously apply here. The record also

contains many features that were not fully developed at the plea bargain hearing, including, but not limited to, mental health problems since Goodwin was ten years old; suggestions by his mother that life in his father's house was "hell" and that Goodwin's father was a narcissistic sociopath; claims that Goodwin had run away from home "so many times;" a description of Goodwin as "a rebel child in adult body;" a suggestion that his relationship with his mother was so difficult that she relinquished parental rights; and a statement that during the period of time when his parents were getting divorced, his parents would start drinking to the point that some nights Goodwin's mother or father would not come home. Goodwin self-reported diagnoses of "depression, PTSD, and Bi-Polar Disorder," along with separately diagnosed ADHD, for which he was taking a variety of medications, the names and purposes of which he himself was not completely sure of.

Further, Dr. Hart's testimony was equivocal and incomplete. On direct examination, he testified that the prospects for rehabilitation were "very good or excellent." He further stated, "I don't see any reason that he would require lengthy incarceration or assessment or treatment or other forms of rehabilitation for specific deterrence or for rehabilitation." On cross-examination, Dr. Hart was asked whether a twenty-year minimum would be appropriate. He responded,

> That's correct. That is -- if I can reframe that. I don't see that any longer period of incarceration would be helpful or necessary to give further protection to public safety. So I think the minimum term of incarceration would adequately protect public safety.

Not exactly an enthusiastic endorsement.

Further, while Dr. Hart did not directly address the *Miller/Lyle/Seats/Roby* factors, he generally characterized Goodwin's

"home environment and family relationships as seriously disturbed," that Goodwin was "almost a captive in an environment that was extremely negative and focused on anger and aggression and violence and guns," and that Goodwin's prospects for rehabilitation were "very good or excellent." In any event, it is not proper to engage in a full-blown resolution of this matter on the merits in this appeal. What the majority has done is not really dismiss the motion to correct an illegal sentence for failure to state a claim but decided it on the merits based on a partial record, without an adversarial presentation in the district court. It does so without finding that Goodwin is one of those uncommon youth for which a mandatory minimum may be constitutionally applied as required by *Roby*. It mistakes our law by suggesting that any individualized hearing on sentencing is adequate if the end sentence is statutorily authorized, and achieves a premature race to judgment by so narrowly construing a pro se petition that it becomes virtually meaningless. The majority here ignores the proper legal framework for evaluation of a pro se claim alleging violation of *Roby* and constitutional provisions relating to cruel and unusual punishment.

Can anyone doubt that the guiding hand of a lawyer would have been helpful for Goodwin at the district court? If counsel would not have been helpful at trial, why was counsel now helpful on appeal? I would reverse the dismissal of Goodwin's motion and remand the case for appointment of counsel and an adversarial process in the district court, where it belongs, to determine if Goodwin is entitled to relief. I take no view, of course, on the ultimate merits of the claim.

### III. Conclusion.

For the above reasons, I would reverse the dismissal of the motion and remand the case to the district court for appointment of counsel.

Wiggins, C.J., joins this dissent.